Vendria PERREIRA, Surviving Spouse
of Augustus J. Perreira, Jr.
(Deceased), Petitioner,

v.

The STATE of Colorado and its Agency,
Fort Logan Mental Health Center, and
Eric Anders, M.D., Respondents.

No. 87SC75.

Supreme Court of Colorado,
En Banc.

Feb. 6, 1989.

Blaine A. Rutenbeck, Denver, Colo.,
Richard K. Walsh, Colorado Springs, Colo.,

Dean P. Grossenbach, Colorado Springs, Colo., for petitioner.

Hall & Evans, Carol M. Welch, William J. Barber, Alan Epstein, Denver, Colo., for respondents.

Kripke, Epstein & Lawrence, P.C., Scott W. Lawrence, Denver, Colo., for amicus curiae, Colorado Trial Lawyers Ass'n.

QUINN, Chief Justice.

The question in this case is whether a state mental health center and its staff psychiatrist can be held liable in tort for the shooting death of a police officer by a mentally ill person, recently released from an involuntary commitment for short-term treatment. In *Perreira v. State of Colorado*, 738 P.2d 4 (Colo.App.1986), the court of appeals reversed a judgment entered on a jury verdict in favor of the surviving wife of the police officer and held that, because the mentally ill person had made no specific threats against particular persons during the period of treatment at the mental health center, the officer was not in the foreseeable zone of danger and that the mental health center and the psychiatrist thus had no legal duty to the officer. We reject this unduly restrictive standard adopted by the court of appeals. We hold that when, as here, a staff psychiatrist of a state mental health facility is considering whether to release an involuntarily committed mental patient, the psychiatrist has a legal duty to exercise due care, consistent with the knowledge and skill ordinarily possessed by psychiatric practitioners under similar circumstances, to determine whether the patient has a propensity for violence and would thereby present an unreasonable risk of serious bodily harm to others if released from the involuntary commitment, and, further, that in discharging this legal duty the psychiatrist may be required to take reasonable precautions to protect the public from the danger created by the release of the involuntarily committed patient, including the giving of due considera-

tion to extending the term of the patient's commitment or to placing appropriate conditions and restrictions on the patient's release. We accordingly reverse the judgment of the court of appeals. Because the standard of duty herein adopted had not been formulated as the controlling law when this case was tried, we believe the interests of fairness require a remand of the case for a new trial.

I.

Before outlining the factual circumstances of this case, it will be helpful to summarize Colorado's statutory scheme for the care and treatment of mentally ill persons existing at the time of the events in question, since that statutory law provides the backdrop for our resolution of the issue before us.

A.

The declared purposes of Colorado's statutory scheme for the care and treatment of mentally ill persons are the following: to secure such care and treatment as will be suited to the needs of mentally ill patients and to ensure that such care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity; to deprive a person of liberty for purposes of care and treatment only when less restrictive alternatives are unavailable or only when the mental patient's safety or the safety of others is endangered; to provide the fullest measure of privacy, dignity, and other rights to mental patients undergoing care and treatment; and to encourage the use of voluntary rather than coercive measures to secure care and treatment for mental illness. § 27–10–101(1), 11 C.R.S. (1982). A mentally ill person means "a person who is of such mental condition that he is in need of medical supervision, treatment, care, or restraint." § 27–10–102(7), 11 C.R.S. (1982).[1] The term "gravely dis-

1. The definition of "mentally ill person" was amended in 1983, so that the present definition reads as follows:

"Mentally ill person" means a person with a substantial disorder of the cognitive, volitional, or emotional processes that grossly impairs judgment or capacity to recognize reali-

abled" means "a condition in which a person, as the result of mental illness, is unable to take care of his basic personal needs or is making irrational or grossly irresponsible decisions concerning his person and lacks the capacity to understand this is so." § 27–10–102(5), 11 C.R.S. (1982).

The statutory scheme provides that when a person appears to be mentally ill and, as the result of such illness, appears to be an imminent danger to others or himself, or appears to be gravely disabled, a "professional person"—*i.e.*, a person licensed to practice medicine in Colorado or a psychologist certified to practice in this state, § 27–10–102(11), 11 C.R.S. (1982)—may place the person in a designated facility for a seventy-two hour emergency evaluation. § 27–10–105(1)(a), 11 C.R.S. (1982).[2] After the evaluation, the detained person may be certified for not more than three months of short-term treatment under the following conditions:

(a) The professional staff of the agency or facility providing seventy-two-hour treatment and evaluation has analyzed the person's condition and has found the person is mentally ill and, as a result of mental illness, a danger to others or to himself or gravely disabled.

(b) The person has been advised of the availability of, but has not accepted, voluntary treatment; but, if reasonable grounds exist to believe that the person will not remain in a voluntary treatment program, his acceptance of voluntary treatment shall not preclude certification.

(c) The facility which will provide short-term treatment has been designated or approved by the executive director [of the Department of Institutions] to provide such treatment.

§ 27–10–107(1), 11 C.R.S. (1982).

Upon the filing of a certification for short-term treatment, the court must forthwith appoint an attorney to represent the mentally ill person, and the attorney may request the court to review the certification. § 27–10–107(5) and (6), 11 C.R.S. (1982). When a certification review is requested, the court is required to conduct a hearing and determine whether the person or facility seeking to detain the person establishes by clear and convincing evidence that such person is mentally ill and as a result of mental illness constitutes a danger to himself or others or is gravely disabled. § 27–10–111(1), 11 C.R.S. (1982). If a psychiatrist in charge of the evaluation and treatment of an involuntarily committed mental patient believes that a period longer than three months is necessary for treatment of the patient, the psychiatrist is required to file with the court an extended certification for treatment for a period of not more than three months. § 27–10–108, 11 C.R.S. (1982). The mental patient is entitled to a hearing on the extended certification under the same conditions as an original certification. *Id.*

When a mentally ill person has received short-term treatment for five consecutive months, the psychiatrist in charge of the evaluation and treatment may file a petition with the court for long-term care and treatment under the following conditions:

(a) The professional staff of the agency or facility providing short-term treatment has analyzed the respondent's [*i.e.*, patient's] condition and has found that the [patient] is mentally ill and, as a result of mental illness, a danger to others or to himself or gravely disabled.

(b) The [patient] has been advised of the availability of, but has not accepted, voluntary treatment; but, if reasonable grounds exist to believe that the [patient] will not remain in a voluntary treatment program, his acceptance of voluntary treatment shall not preclude an order pursuant to this section.

---

ty or to control behavior; mental retardation is insufficient to either justify or exclude a finding of mental illness within the provision of this article.

**2.** Section 27–10–105(1)(a), 11 C.R.S. (1982), also authorizes a peace officer or a licensed social worker to initiate emergency procedures for evaluation. The statute was amended in 1983 to include a registered professional nurse skilled in psychiatric nursing in the list of persons authorized to initiate emergency procedures. § 27–10–105(1)(a), 11 C.R.S. (1988 Supp.).

(c) The facility which will provide long-term care and treatment has been designated or approved by the executive director [of the Department of Institutions] to provide such care and treatment.

§ 27–10–109(1), 11 C.R.S. (1982). Every petition for long-term care and treatment must include a request for a hearing before the court prior to the expiration of six months from the date of original certification. § 27–10–109(2), 11 C.R.S. (1982). Within ten days after the receipt of the petition, the patient or his attorney may obtain a jury trial by filing a written request with the court. § 27–10–109(3), 11 C.R.S. (1982). If the jury or court determines that the patient has already received treatment for five consecutive months and is still mentally ill and as a result thereof is a danger to others or himself or is gravely disabled, the court is authorized to issue an order of long-term care and treatment for a term not to exceed six months. § 27–10–109(4), 11 C.R.S. (1982). An order for long-term care and treatment expires upon the date specified therein unless further extensions for six month periods are sought and authorized based on the fact that the patient continues to be mentally ill and, as a result of the illness, continues to be a danger to others or himself or continues to be gravely disabled. § 27–10–109(5), 11 C.R.S. (1982).

A person receiving treatment pursuant to a short-term or long-term certification is entitled to "medical and psychiatric care and treatment suited to meet his individual needs and delivered in such a way as to keep him in the least restrictive environment possible." § 27–10–116(1)(a), 11 C.R.S. (1982). Whenever in the opinion of the psychiatrist in charge of treatment the patient "has received sufficient benefit from such treatment for him to leave," the psychiatrist may terminate an original certification for short-term treatment or a certification for extended short-term treatment and may also terminate an order for long-term care and treatment. § 27–10–110(1), 11 C.R.S. (1982). When a certification or extended certification is terminated, the psychiatrist in charge of treatment is required to notify the court in writing within five days of such termination. *Id.* In the case of a mentally ill person who is a danger to himself or others or is gravely disabled, "any interested person"—clearly a category broad enough to encompass the staff psychiatrist in charge of an involuntarily committed patient's treatment—may petition the court to deprive such person of certain rights or to impose certain legal disabilities on the person, consistent with the person's needs and the interests of public safety. § 27–10–125, 11 C.R.S. (1988 Supp.).

The statutory scheme is thus calculated to provide care and treatment adequately suited to the needs of the mental patient in a dignified and least restrictive manner and, at the same time, to ensure against the premature release of a mental patient when such release would pose a likely risk of serious bodily harm to the patient or others as a result of the patient's mental condition.

### B.

In this case Vendria Perreira (plaintiff) filed a wrongful death action against the State of Colorado, the Fort Logan Mental Health Center (Fort Logan), a public hospital and agency of the STATE of Colorado, and Dr. Eric Anders, the staff psychiatrist at Fort Logan responsible for the care and treatment of Seth Buckmaster, a mentally ill person who was certified for short-term treatment at Fort Logan. The complaint alleged, *inter alia*, that Fort Logan and Dr. Anders were negligent in releasing Buckmaster from the short-term certification and that their negligence was the cause of Buckmaster's subsequent act of shooting and killing the plaintiff's husband, Augustus Perreira, approximately four months after Buckmaster's release. Prior to trial the parties stipulated that Fort Logan is a psychiatric hospital within the Department of Institutions of the State of Colorado and that at all times pertinent to this case Dr. Anders was the primary health care provider in charge of the treatment team for Buckmaster and was acting within the scope of his authority as a staff

psychiatrist for Fort Logan. The State of Colorado, Fort Logan, and Dr. Anders defended on the basis that the complaint failed to state a claim for relief and that Dr. Anders was not negligent in treating Buckmaster and releasing him from an involuntary commitment.

The case was tried to a jury, and the evidence at trial disclosed the following course of events. Seth Buckmaster had a long history of mental illness and was originally treated at Fort Logan in 1975. In February of that year Buckmaster's sister petitioned the Arapahoe County District Court for an order requiring a mental evaluation of Buckmaster, claiming that he had come to believe that his ex-wife and her family were trying to poison him and that he constituted a danger to family members.[3] Buckmaster was evaluated at the Arapahoe Mental Health Center and was thereafter certified for short-term treatment at Fort Logan. Hospital records admitted into evidence show that on his admission Buckmaster was suspicious and noncommunicative and was placed on an antipsychotic medication in order to relieve his anxiety and to organize his thinking processes. On March 7, 1975, while still medicated, he was released from Fort Logan and instructed to receive outpatient treatment at the Arapahoe Mental Health Center.

Fort Logan's next contact with Buckmaster occurred on May 31, 1979. As a result of a family disturbance, the Arapahoe Mental Health Center performed an evaluation of Buckmaster and determined that he had "a high potential to become rageful and assaultive" and that he had "verbally threatened his family and physically beat[en] his 70 year old father."[4] The Arapahoe Mental Health Center recommended that Buckmaster be transferred to Fort Logan for a seventy-two hour evaluation of his need for short-term involuntary

treatment. Buckmaster was taken to Fort Logan and interviewed by Dr. Anders and a staff clinical psychologist, Dr. Rita Vollman. Both Dr. Anders and Dr. Vollman learned that Buckmaster had been hospitalized for six months in 1976 at a Veterans Administration Hospital in Kansas where he was treated with antipsychotic drugs and diagnosed as a paranoid schizophrenic in remission and that upon his release from the hospital he had received outpatient treatment with antipsychotic medication at the Arapahoe Mental Health Center for approximately six months. Dr. Anders and Dr. Vollman also learned that Buckmaster had experienced several confrontations with the police, including a disturbance charge, and that two days prior to his admission he had been arrested and charged with carrying a concealed weapon. On being asked about his arrest, Buckmaster told the doctors that he had been sleeping in his car with his gun beside him and that upon being awakened by the police he picked up the gun because he wanted to take it with him but then decided to put it in his pocket right in front of the policeman. The doctors, upon further interrogation of Buckmaster, learned that he had owned a gun since 1975 and that he expected the court to return the gun to him upon his discharge from the hospital. On June 1, 1979, Fort Logan released Buckmaster from the seventy-two hour evaluation as not certifiable for short-term treatment. Dr. Anders at this time diagnosed Buckmaster as suffering from paranoid schizophrenia which, in his view, was in remission at present, but also noted in his records "lengthy 1976 hospitalization ominous."

On August 29, 1979, while Buckmaster was apparently on trial for loitering, the court ordered him transferred to the Arapahoe Mental Health Center for a competency determination. Buckmaster was found to be psychotic and disruptive and was

---

3. Section 27–10–106(2), 11 C.R.S. (1982), authorizes any individual to file a petition with the court in the county in which the mentally ill person resides for an evaluation of the person's condition. The petition must allege that the person for whom an evaluation is requested appears to be mentally ill and, as a result thereof, appears to be a danger to others or himself or appears to be gravely disabled.

4. There is some evidence indicating that this incident consisted of the father throwing an ashtray at Buckmaster and Buckmaster then kicking the father in the shins.

transferred to Fort Logan for a seventy-two hour emergency evaluation. Dr. Mary McEnany, a member of the Fort Logan staff, examined Buckmaster and noted that he believed the police were controlling his thoughts, were burning his feet and ear with a radiation gun, were interfering with his mail, and were causing problems with his automobile. Dr. Anders and Dr. Vollman also examined Buckmaster on this occasion. Dr. Anders was of the opinion that Buckmaster was suffering from the delusion that the police were trying to "irradiate" him. Dr. Vollman found that Buckmaster's condition had deteriorated since his last admission in May and that his paranoid state had exacerbated to the point that he blamed the police for all his misfortunes—the nondelivery of his mail, the mechanical problems with his car, and the blisters on his feet. Despite his mental condition, Buckmaster was discharged from Fort Logan on the afternoon of August 30, 1979.

Less than two months later, on October 18, 1979, Buckmaster was again brought to Fort Logan for the fourth time since 1975, and the third time in less than six months. The precipitating event for this admission was Buckmaster's visit to Colorado General Hospital where he complained of burns from radiation in the air. The so-called burns, however, were actually blisters which had apparently developed when his foot rubbed against his shoe. Colorado General Hospital referred Buckmaster to Fort Logan for a seventy-two hour emergency evaluation. Dr. Anders and Dr. Vollman interviewed Buckmaster and found him to be very angry, incomprehensible in his speech, seriously disorganized in his thinking, and extremely delusional about the police. Buckmaster blamed the police for placing radiation in the air, for causing his radiation burns, and for interfering with his ability to recover all the money and other belongings which he claimed had been taken from him by the police. It was learned that Buckmaster had been living and sleeping on the streets for a considerable period of time and ate very little food. Dr. Anders filed with the court a certification for short-term treatment on the basis that Buckmaster was

gravely disabled as a result of his obvious inability, caused by his mental illness, to take care of his basic personal needs.

During Buckmaster's first week at Fort Logan, he was confined to a treatment ward. Dr. Anders was of the view that Buckmaster was greatly in need of antipsychotic medication to relieve his anxiety and organize his thinking. Although the doctor prescribed antipsychotic medication, Buckmaster refused to take it. Dr. Anders realized that he could have sought a court order for the administration of the medicine over Buckmaster's objection, but the doctor declined to do so, preferring instead to attempt to convince Buckmaster to take the medication voluntarily. Buckmaster, however, never took any antipsychotic medication during his stay at Fort Logan.

After the first week following his admission, Buckmaster was transferred to a halfway house located on the grounds of Fort Logan and was permitted to leave the grounds to seek employment at a labor pool in Denver. While at the halfway house, Buckmaster attended only two group therapy meetings. He was somewhat hostile and abusive with another patient on October 30, although not physically violent, and on November 19 he was arrested for failure to appear in court. While in custody Buckmaster called Dr. Vollman for assistance. Dr. Vollman agreed, with Dr. Anders' approval, to take over Buckmaster's therapy sessions, and Buckmaster met with the doctor on two or three occasions prior to his release from Fort Logan.

Notwithstanding Buckmaster's refusal to take any antipsychotic medication and the existence of delusional symptoms, Dr. Anders terminated short-term treatment on December 11, 1979, slightly less than two months from the certification for short-term treatment. Since Dr. Anders was not aware of any serious acts of violence in Buckmaster's past, the doctor was of the opinion that Buckmaster did not pose any risk of violence to others upon his release. Dr. Anders' discharge summary stated that Buckmaster's "more florid delusional symptoms" had subsided and that, since Buckmaster had refused all treatment, his

improvement at this time was probably maximal. Dr. Vollman, who had wanted Buckmaster to remain at Fort Logan for additional psychiatric treatment as a voluntary patient, noted in her records that Buckmaster's thought content at the time of his release was still "noticeably paranoid." The evidence at trial showed that Dr. Anders spent a total of two hours and thirty-five minutes with Buckmaster from the time of Buckmaster's admission on October 18 to the termination of treatment on December 11, 1979, and that both Dr. Anders and other members of the Fort Logan staff knew that Buckmaster, upon his release, intended to obtain the revolver which the police had taken from him when he was previously arrested.

On April 1, 1980, approximately four months after his release from Fort Logan, Buckmaster created a disturbance at a Colorado Springs convenience store. He was talking to himself, muttering profanities, and sitting on the floor near the front door. The sales clerk told him to leave but Buckmaster refused. The clerk then flagged down Colorado Springs police officer Augustus Perreira. The officer escorted Buckmaster out of the store where they spoke for a few minutes in the parking lot. Buckmaster suddenly pulled out a gun and, without warning, fired several shots at the officer and killed him. As a result of the officer's death, murder charges were filed against Buckmaster, and he was ultimately adjudicated not guilty by reason of insanity.[5]

The plaintiff presented expert opinion evidence from Dr. Seymour Sundell, a psychiatrist who had examined Buckmaster in connection with Buckmaster's insanity plea. It was Dr. Sundell's opinion that, based on his examination of Buckmaster and his review of various medical records pertaining to his psychiatric problems, Dr. Anders was negligent in treating Buckmaster and in releasing him from Fort Logan in December 1979. Dr. Sundell testified that a more thorough evaluation of Buckmaster's mental condition was required due to the presence of several factors, namely: Buckmaster's rapid deterioration during the six months preceding his last commitment; his severe paranoid schizophrenia; the fact that he had experienced serious delusions concerning police harassment; his access to a gun upon his release; and his obvious need for antipsychotic medication notwithstanding his refusal to voluntarily take it. In his testimony Dr. Sundell distinguished between the predictability of violent behavior and the recognizability of danger. The doctor acknowledged that although a psychiatrist might not be able to predict whether a particular involuntarily committed mental patient will commit acts of violence in the future, a trained psychiatrist nonetheless would be able to recognize whether the same patient, if released, will pose a significant risk of serious bodily harm to others. In Dr. Sundell's opinion, Buckmaster posed a serious risk of harm to others at the time of his release and his potential for violence should have been recognized by Dr. Anders. The plaintiff's other expert witness, Dr. Richard Conde, a psychiatrist, basically corroborated Dr. Sundell's opinion. Dr. Conde testified that Buckmaster had many symptoms of paranoid schizophrenia on the date of his discharge from Fort Logan and that these psychiatric symptoms, along with his preoccupation with a gun, rendered him a danger to others. Both Dr. Sundell's and Dr. Conde's opinions were challenged by a defense psychiatrist, who testified that Buckmaster was properly released from Fort Logan on December 11, 1979, and that it was not reasonably foreseeable at that

---

**5.** During the trial of the instant case, the plaintiff's attorney cross-examined Dr. Anders regarding his testimony during Buckmaster's insanity trial. Dr. Anders acknowledged that at Buckmaster's insanity trial he testified that Buckmaster had been suffering from serious delusions regarding police harassment at the time of his release from Fort Logan. The doctor also acknowledged his prior testimony, given at the insanity trial, that Buckmaster, upon termination of short-term treatment on December 11, 1979, wanted to stay at the halfway house at Fort Logan. Buckmaster, according to Dr. Anders, in his paranoid way of thinking wanted an outside force to tell him to leave Fort Logan, so the doctor ordered him to leave the grounds and warned him that if he returned the security officer would run him off.

time that his release would create a risk of harm to others.

At the conclusion of the plaintiff's case, and again at the conclusion of all the evidence, Fort Logan and Dr. Anders moved to dismiss the case on the basis that Dr. Anders had no legal duty to protect Officer Perreira from the fatal shooting by Buckmaster. The trial court denied the motions to dismiss. In settling jury instructions, the trial court refused an instruction, tendered by Fort Logan and Dr. Anders, on the scope of Dr. Anders' duty arising out of a special relationship existing between the doctor and Buckmaster. The tendered instruction stated, in pertinent part, that in the event a special relationship existed between Dr. Anders and Buckmaster, then Fort Logan and the doctor had the duty

> to take whatever steps are reasonably necessary to protect an intended or potential victim of their patient when they determine, or should have determined, in the exercise of that reasonable degree of care, knowledge and skill ordinarily possessed by members of the psychiatric or psychological professions, that their patient, Mr. Buckmaster, was or may have presented a probability of danger to the potential victim.

The trial court instead instructed the jury that it was the duty of a mental health care provider, such as Fort Logan, to exercise reasonable care in administering to the needs of a mental patient and to employ caution and protection consistent with the known conditions and needs of the patient and that Dr. Anders, as the psychiatrist responsible for Buckmaster's treatment, was obligated to use "his skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists who have devoted special study and attention to the same field of expertise." The court also instructed the jury that a

6. For purposes of the issue of causation, the court instructed the jury that the negligence, if any, of Dr. Anders was not to be considered a cause of the damages to the plaintiff unless injury to a person in Officer Perreira's situation was a reasonably foreseeable consequence of that negligence. The instruction further stated:

psychiatrist, such as Dr. Anders, "is not negligent because of his selection of a particular course of treatment or procedure, if the selection is consistent with the skill and care which other physicians practicing in the same field of practice ... would use under the same or similar circumstances." [6] The jury returned a verdict in favor of the plaintiff on the issue of liability and, pursuant to stipulation of the parties, the court entered judgment on the verdict in the amount of $150,000, which is the maximum amount that can be recovered against the state for injury to one person in any single occurrence under section 24-10-114(1) of the Colorado Governmental Immunity Act. §§ 24-10-101 to -120, 10A C.R.S. (1988).

In reversing the judgment, the court of appeals stated that there is no duty "to prevent a third person from harming another unless a special relation exists 'between the actor and the wrongdoer or between the actor and the victim,'" and that even with the existence of a special relationship "a psychotherapist has no legal duty to third persons under the special relation rule unless the patient made specific threats against specific individuals." *Perreira*, 738 P.2d at 5-6. Since Buckmaster had not made any specific threats against any specific individuals during the period of his involuntary commitment to Fort Logan, the court of appeals held that Dr. Anders had no legal duty to Officer Perreira. We granted the plaintiff's petition for certiorari to determine whether, under the particular circumstances of this case, Dr. Anders, as the staff psychiatrist of Fort Logan and the person responsible for Buckmaster's treatment, owed a legal duty to protect members of the public, including a police officer who might encounter Buckmaster in the course of a routine investigation, from the violence perpetrated by Buckmaster after his release from Fort Logan.

"The exact or precise injury need not have been foreseeable, but it is sufficient if a reasonably careful person, under the same or similar circumstances, would have anticipated that injury to a person in Officer Perreira's situation might result from the defendant's conduct." *See* CJI-Civ.2d 9:30.

## II.

In urging reversal of the judgment, the plaintiff argues that the court of appeals adopted an unduly restrictive standard when it held that there must be "specific threats against specific individuals" before a psychiatrist can be held liable in tort for acts of violence committed by a mentally ill person whom the psychiatrist has released from an involuntary commitment. In order to address this argument, it is necessary first to review basic principles of tort law on the issue of duty and then the developing law addressing a psychiatrist's duty of due care to protect others from potential acts of violence by a mentally ill patient.

### A.

■ To recover on a claim in negligence, the plaintiff must establish the existence of a legal duty, breach of the duty, causation, and damage. *E.g., Leake v. Cain,* 720 P.2d 152, 155 (Colo.1986). A negligence claim, therefore, will fail if the claim is based on circumstances for which the law imposes no duty. *University of Denver v. Whitlock,* 744 P.2d 54, 56 (Colo.1987). Whether a defendant owes a legal duty to the plaintiff is a question of law. *Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.1980). "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." *Metropolitan Gas Repair Service,* 621 P.2d at 317. A court's conclusion that a duty does or does not exist is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." *University of Denver,* 744 P.2d at 57 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton On the Law of Torts* § 53, at 358 (5th ed. 1984)). If a court determines that the defendant owed a legal duty to the plaintiff, then the question of whether the defendant has breached that duty and thereby caused damage to the plaintiff is a matter for the jury's determination. *Met-*

*ropolitan Gas Repair Service,* 621 P.2d at 317.

Generally, in the absence of special circumstances, the law does not impose a duty upon a person to take action for the protection of another even if it is reasonably apparent that such action is necessary to protect the other person from injury or peril. *See Restatement (Second) of Torts* § 314 (1965). This rule has its source "in the early common law distinction between action and inaction, or 'misfeasance' and 'non-feasance.'" *Id.* comment c. The reason for the rule "may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs." *University of Denver,* 744 P.2d at 57 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on The Law of Torts* § 56, at 373 (5th ed. 1984)).

■ A duty is imposed in a nonfeasance situation, however, when a special relationship exists between the defendant and a third party wrongdoer, or the defendant and the potential victim of the wrongdoer's action. *Id.* at 58. The special relations giving rise to a duty to take affirmative protective action include those situations in which a person "is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection." *Restatement (Second) of Torts* § 314A (1965). Where "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct," then the actor is under a duty "so to control the conduct of a third person as to prevent him from causing physical harm to another." *Restatement (Second) of Torts* § 315 (1965). In similar fashion, the law has recognized a duty to exercise reasonable care in preventing harm to others in those situations in which a person takes charge of another "whom he knows or should know to be likely to cause bodily

harm to others if not controlled." *Restatement (Second) of Torts* § 319 (1965).

■ In addition to the existence of a special relationship, a court may appropriately consider other factors in determining the existence and scope of a legal duty. One of these factors is the foreseeability of harm from the failure to take protective action for the benefit of others. Foreseeability is based on common sense perceptions of the risks created by various conditions and circumstances and " 'includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.'" *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 48 (Colo.1987) (quoting 3 F. Harper, F. James, & O. Gray, *The Law of Torts* § 18.2, at 658–59 (2d ed. 1986)). While an important factor for consideration, foreseeability by itself, however, does not establish the existence of a legal duty. *Taco Bell, Inc.,* 744 P.2d at 46. Other factors include: the social utility of the actor's conduct; the magnitude of the burden of guarding against the injury; the consequences of placing that burden upon the actor; and any other relevant factors based on the competing individual and social interests implicated by the facts of the case. *See University of Denver,* 744 P.2d at 57; *Taco Bell, Inc.,* 744 P.2d at 46; *Smith v. City and County of Denver,* 726 P.2d 1125, 1127 (Colo.1986).

### B.

Cases addressing the existence and scope of a psychiatrist's duty to protect others from the violent acts of a mentally ill patient have applied these general principles of duty in varying degrees. These cases range over a continuum that reflects diverse levels of control over the patient's treatment with corresponding degrees of responsibility for the patient's actions.

### 1.

At one end of the continuum are cases involving the treatment of a mentally ill person who voluntarily seeks treatment as an outpatient. *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976), is the seminal case with respect to the psychotherapist's duty to protect potential victims from violent acts by a mental patient whom the therapist is treating as a voluntary outpatient. In *Tarasoff,* a university student sought voluntary outpatient therapy from a psychologist at the university hospital. During the course of treatment the student communicated to the therapist his intention to kill an unnamed but identifiable young woman when she returned home from a summer trip to Brazil, and shortly thereafter he killed her. Drawing on the special relationship existing between a psychotherapist and a patient, the California Supreme Court held that the therapist had a duty to take protective action for the benefit of the potential victim:

> When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

17 Cal.3d at 431, 551 P.2d at 340, 131 Cal.Rptr. at 20. Acknowledging the difficulty in forecasting whether a patient presents a serious danger of violence to others, the court emphasized that in making that determination the treating therapist is required to exercise only that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of that particular professional specialty under similar circumstances. 17 Cal.3d at 438, 551 P.2d at 345, 131 Cal. Rptr. at 25.[7]

---

**7.** In addressing the argument that the psycho-

therapist's disclosure of the patient's threat

Because in these cases the therapist is treating the mentally disturbed person as a voluntary outpatient and has limited opportunity to observe and determine the patient's violent propensities, with even less opportunity to control the patient's behavior, some courts have limited the duty to take protective action to those instances in which the patient makes a specific threat against a readily identifiable victim. *E.g.*, *Thompson v. County of Alameda*, 27 Cal. 3d 741, 752–53, 614 P.2d 728, 734, 167 Cal. Rptr. 70, 76 (1980) (*Tarasoff* duty to warn limited to readily identifiable victims); *see also Brady v. Hopper*, 751 F.2d 329 (10th Cir.1984) (on basis of assumption that Colorado would follow "specific threat to specific person" rule, Tenth Circuit Court of Appeals held that psychiatrist who treated John W. Hinckley, Jr. on outpatient basis owed no duty to persons who were shot and seriously injured in course of Hinckley's attempt to assassinate President Reagan, since Hinckley made no threats against the President or anyone else during treatment). Other courts have not so limited the psychiatrist's duty, but instead have imposed a duty of reasonable care to protect potential victims against the voluntary patient's acts of violence whenever the psychiatrist has reason to foresee, in accordance with accepted psychiatric standards of practice, that the patient presents an unreasonable risk of serious bodily harm to others. *McIntosh v. Milano*, 168 N.J.Super. 466, 403 A.2d 500 (1979) (even though mentally disturbed teenager, treated as outpatient on weekly basis, had not communicated to psychiatrist specific threats of violence toward identifiable victim, psychiatrist had reason to know that patient presented a clear danger to victim and thus had duty to take reasonably necessary measures to protect victim against violence by patient); *Schuster v. Altenberg*, 144 Wis.2d 223, 424 N.W.2d 159 (1988) (complaint stated claim for relief based on psychiatrist's failure to take reasonable measures to protect members of public from dangerous conduct of voluntary mental patient, including giving adequate warnings to patient of risks associated with driving automobile and, if necessary, inducing voluntary commitment proceedings or initiating involuntary commitment proceedings).[8]

would result in the revelation of a confidential communication between the patient and the therapist, the *Tarasoff* court stated:

We realize that the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened. To the contrary, the therapist's obligations to his patient require that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger. (See Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1065–1066).

The revelation of a communication under the above circumstances is not a breach of trust or a violation of professional ethics; as stated in the Principles of Medical Ethics of the American Medical Association (1957), section 9: "A physician may not reveal the confidence entrusted to him in the course of medical attendance ... *unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community.*" (Emphasis added.) We conclude that the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. The protective privilege ends where the public peril begins.

17 Cal.3d at 441–42, 551 P.2d at 347, 131 Cal. Rptr. at 27; *see also Schuster v. Altenberg*, 144 Wis.2d 223, 250–52, 424 N.W.2d 159, 170–71 (1988). We note here that there is no issue involving the disclosure of confidential communications in the instant case.

**8.** In 1986 the Colorado legislature enacted section 13–21–117, 6A C.R.S. (1987), which outlines the duty of mental health professionals in dealing with a patient who manifests violent propensities to others. Although this statute did not become effective until May 22, 1986, ch. 111, sec. 2, § 13–21–117, 1986 Colo.Sess.Laws 687, 688, and hence is not applicable to the case before us, it nonetheless is instructive at least as to the duty of a psychiatrist in treating a voluntary outpatient. Section 13–21–117 exempts physicians, psychologists, other mental health professionals, and mental health hospitals and centers from civil liability for damages "for failure to warn or protect any person against a mental health patient's violent behavior," and

## 2.

At midpoint in the continuum are cases involving a mentally ill person who voluntarily seeks psychiatric treatment in a hospital as an inpatient. Here again, there are divergent views on the issue of duty. In *Hasenei v. United States*, 541 F.Supp. 999 (D.Md.1982), although dealing with a situation involving a voluntary *outpatient* being treated at a Veterans Administration outpatient clinic for schizophrenia and alcoholism, the court concluded that the typical relationship between a psychiatrist and a *voluntary* patient was such that the relationship lacked sufficient elements of control to give rise to a legal duty to protect third parties from violent acts by the patient. The court accordingly held that the federal government was not liable under the Federal Tort Claims Act for injuries sustained by the Haseneis in a head-on automobile collision caused by the mentally ill person under treatment at the outpatient clinic, stating as follows:

Section 315 [of the *Restatement (Second) of Torts*] thus first states the general rule that an actor has "no duty so to control the conduct of a third person as to prevent him from causing physical harm to another." There is, however, an exception to this general rule whenever "a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Implicit in that exception, however, is the proposition that such a special relationship must include the right or the ability to control another's conduct. *Restatement* §§ 316–319 lists the relationships which require the actor to control the third person's conduct. *Restatement* § 315 Comment c. In all of those relationships, the actor has either the right or the ability to control the third person's conduct. Thus, in the absence of a relationship involving such control, the exception to the general rule, that there is no duty to control the conduct of a third person for the protection of others, should not be applicable. An examination of the relationship which existed between Garber [psychiatrist] and Hock [patient] on August 9, 1976, indicates that Garber had neither the right nor the ability to control Hock's conduct. In fact, the typical relationship existing between a psychiatrist and a voluntary outpatient would seem to lack sufficient elements of control necessary to bring such relationship within the rule of § 315. Indeed, lack of control by the therapist and maximum freedom for the patient is oft times the end sought by both the psychiatric profession and the law.

541 F.Supp. at 1009–10 (footnotes omitted).[9]

Other courts have held that when a treating psychiatrist knows or has reason to know that the patient, if released, will present a risk of serious bodily harm to others, the psychiatrist has a duty to take

further exempts mental health care providers from civil liability for failure to predict such violent behavior, "except where the patient has communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons." The statute further provides that when a patient does communicate "a serious threat of imminent physical violence against a specific person or persons," the duty of a mental health care provider to take affirmative protective action shall be discharged "by the mental health care provider making reasonable and timely efforts to notify any person or persons specifically threatened, as well as notifying an appropriate law enforcement agency or by taking other appropriate action including, but not limited to, hospitalizing the patient." § 13–21–117, 6A C.R.S. (1987).

9. Sections 316 to 319 of the *Restatement (Second) of Torts*, to which the court in *Hasenei* made express reference, list the following "special" relationships as supportive of a legal duty to others. Section 316 of the *Restatement (Second) of Torts* (1965) deals with the duty of a parent to control the conduct of a child, section 317 with the duty of a master to control the conduct of a servant, section 318 with the duty of a possessor of land or chattel to control the conduct of a licensee, and section 319 with the duty of those in charge of a person having dangerous propensities. The comment to section 319 gives the following illustration: "A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and caused harm to C. A is subject to liability to C."

reasonable precautions—including, if necessary, the temporary detention of the patient until an involuntary commitment can be accomplished—in order to protect potential victims from the patient's violent propensities. *E.g., Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980) (psychiatric staff of Veterans Administration hospital treating previously committed patient as outpatient had duty to initiate whatever precautions were reasonably necessary to protect potential victims from violence when staff knew or should have known of patient's dangerous propensities); *Williams v. United States,* 450 F.Supp. 1040 (D.S.D.1978) (under theory of negligent release, government liable for shooting death of three persons one day after mentally ill person was released from Veterans Administration hospital, where patient had history of chronic psychosis and violence, hospital staff knew that patient was dangerous but made no effort to seek involuntary commitment before release, and hospital failed to notify law enforcement authorities of patient's release even though criminal charges were pending against patient); *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693 (1982) (where staff of private mental hospital knew that voluntary patient would likely cause serious bodily harm to his wife if patient had opportunity to do so, hospital had duty to exercise reasonable care in controlling patient and breached duty by issuing unrestricted weekend pass to patient, who thereafter purchased gun and shot and killed his wife).

### 3.

At the end of the continuum are those cases dealing with a mentally ill person who has been involuntarily committed to a mental hospital by order of court. In Colorado, such involuntary commitment results from one of two determinations: (1) that the person is mentally ill—that is, of such mental condition that he is in need of medical supervision, treatment, or restraint, § 27–10–102(7), 11 C.R.S. (1982)—and as a result thereof is a danger to himself or others; or (2) that the person is mentally ill and as a result thereof is gravely disabled—that is, unable to take care of his basic needs or is making irrational or grossly irresponsible decisions concerning his person and lacks the capacity to understand that this is so, § 27–10–102(5), 11 C.R.S. (1982). *See* § 27–10–107, 11 C.R.S. (1982 & 1988 Supp.) (procedures for certification for short-term treatment), and § 27–10–109, 11 C.R.S. (1982 & 1988 Supp.) (procedures for long-term care and treatment). Once a mentally ill person has been involuntarily committed to a mental health facility, the treating psychiatrist has adequate opportunity to learn of the patient's condition, including any propensity to violence, and the corresponding ability to prolong the patient's confinement in the interest of the patient's safety and the safety of others.

The ability of a psychiatrist to exercise control over the decision to release an involuntarily committed patient has led several courts to recognize a duty on the part of the treating psychiatrist to protect members of the public from violent acts committed by such person upon that person's release from an involuntary commitment. In *Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d 86 (1983), for example, the Kansas Supreme Court recognized a cause of action against a staff psychiatrist of a state mental hospital for the negligent release of an involuntarily committed patient, Bradley Durflinger, who, notwithstanding a history of violence and serious mental illness, was discharged approximately three months after his commitment and shortly thereafter killed his mother and younger brother by shooting them with a rifle. While the Kansas statutory scheme defined the term "mentally ill person" to include a person who by reason of mental impairment is in need of care and treatment and is or will probably become dangerous to himself or others if not provided care and treatment, the court in its opinion placed particular emphasis on the fact that the commitment itself required the hospital and its staff to maintain the patient under care and treatment until he no longer constituted a danger to himself or others:

The hospital was required to provide care or treatment for Bradley. The "head of the hospital" was required to discharge Bradley when he was "no longer in need of 'care and treatment'" (K.S.A.1973 Supp. 59–2924), i.e. no longer dangerous to himself or *others*. The three defendant-physicians were involved in the hospital team recommendation to the head of the hospital (hospital superintendent) that Bradley was no longer in need of care or treatment, i.e. no longer dangerous to himself or others. The making of the recommendation by the physicians to discharge or retain Bradley as a patient was a basic part of their professional employment. This professional duty obviously was for the benefit of Bradley and the public. We find no rational basis for insulating this one aspect of professional service from liability for negligence occurring in the performance thereof.

234 Kan. at 491–93, 673 P.2d at 93–94. Other courts have reached similar results on the issue of legal duty and have done so without placing any special significance on the precise statutory basis on which the commitment was predicated. *See, e.g., Naidu v. Laird*, 539 A.2d 1064 (Del.1988) (upholding judgment against state hospital psychiatrist based on psychiatrist's failure to take reasonable steps to protect potential victim from violence resulting from release of committed patient who killed victim in automobile accident while in psychotic state); *Homere v. State*, 79 Misc.2d 972, 361 N.Y.S.2d 820 (1974) (under theory of negligent release, state hospital liable for injuries suffered by plaintiffs assaulted by a patient released from state hospital on day of assault where, notwithstanding patient's extensive history of mental care and treatment and past acts of violence, hospital commission authorized release without an updated reevaluation of patient's condition), *aff'd*. 48 A.D.2d 422, 370 N.Y.S.2d 246 (1975); *Pangburn v. Saad*, 73 N.C. App. 336, 326 S.E.2d 365 (1985) (complaint against state hospital and staff psychiatrist stated claim for relief in reckless negligence and intentional misconduct where it alleged that staff psychiatrist released in-

voluntarily committed patient who stabbed sister shortly after release, and release decision was made notwithstanding several prior admissions to mental hospitals, history of violence, and parents' objection to patient's release due to their fear of his violent acts); *Petersen v. State*, 100 Wash.2d 421, 671 P.2d 230 (1983) (psychiatrist at state hospital who diagnosed patient, committed as "gravely disabled," as a paranoid schizophrenic with drug-related problems had duty to take reasonable precautions to protect persons who might be endangered by patient's dangerous propensities, including duty to petition for extended commitment). *Contra, e.g., Sherrill v. Wilson*, 653 S.W.2d 661 (Mo.1983) (staff psychiatrist of state hospital owed no duty to general public with respect to release of involuntarily committed patient who, when released on two day pass, killed a boy by shooting him eleven times with a rifle).

Judicial decisions imposing a duty of due care in releasing an involuntarily committed patient recognize an obvious difference between the nature of the legal duty and the appropriate discharge of that duty. The duty of the psychiatrist in such a case is to use reasonable care, in accordance with the knowledge and skill ordinarily possessed by psychiatric practitioners under similar circumstances, to protect potential victims from future acts of violence by the patient. That duty comes into being when the psychiatrist, again in accordance with accepted psychiatric practices, knows or has reason to know that due to the patient's propensity for violence the unconditional release of the patient will create an unreasonable risk of serious bodily harm to others. *E.g., Naidu*, 539 A.2d 1064; *Durflinger*, 234 Kan. 484, 673 P.2d 86; *Petersen*, 100 Wash.2d 421, 671 P.2d 230; *see also White v. United States*, 780 F.2d 97 (D.C.Cir.1986).

█ To be sure, the fact that an involuntarily committed patient has made specific threats against particular individuals during the patient's term of commitment could well be indicative of the patient's propensity to commit violent acts upon release, as might a history of pre-commitment violence

or recent acts of violence during the term of commitment. The absence of specific threats or overt violent behavior, however, is not necessarily conclusive on the issue of a patient's lack of propensity for violent conduct. The patient's history of behavioral disorders and present mental condition may be such that, notwithstanding the absence of specific threats and past or present violent behavior, a reasonably competent psychiatrist, utilizing accepted diagnostic criteria, would conclude that the patient's mental condition is such as to render the patient disposed to commit violent acts against others. Under such circumstances, the psychiatrist would be obliged to take reasonable precautions, consistent with accepted psychiatric standards of practice, to protect potential victims from the patient's propensity for violence. *See generally Lipari*, 497 F.Supp. at 193; *Naidu*, 539 A.2d at 1072–73; *McIntosh*, 168 N.J.Super. at 489–90, 403 A.2d at 511–12; *Littleton v. Good Samaritan Hospital and Health Center*, 39 Ohio St.3d 86, 99, 529 N.E.2d 449, 460 (1988); *Petersen*, 100 Wash.2d at 428, 671 P.2d at 237; *Schuster*, 144 Wis.2d at 258–59, 424 N.W.2d at 174.

■■■ A psychiatrist, of course, will not be held liable for the violent acts of a patient released from an involuntary commitment if the psychiatrist, after employing accepted techniques of psychiatric diagnosis, makes a reasonable and good faith decision that the patient does not have a propensity for violent acts and thus would not constitute an unreasonable risk of serious bodily harm to others after release. *See Littleton*, 39 Ohio St.3d at 99, 529

N.E.2d at 460 (discussing duty in voluntary hospitalization context). In those situations where the involuntarily committed patient is diagnosed as having violent propensities, a psychiatrist may discharge the duty of due care by taking reasonably necessary precautions to protect potential victims, including, where psychiatrically indicated, the giving of appropriate consideration to extending the term of the patient's commitment or to placing appropriate conditions and restrictions on the patient's release. *Id.; see also Lipari*, 497 F.Supp. at 193; *McIntosh*, 168 N.J.Super. at 489, 403 A.2d at 511–12.[10]

### C.

■■■ As the above discussion shows, the question of legal duty is a multifaceted issue, the resolution of which ultimately turns on a careful weighing of various factors in the evidentiary context of the case at hand. Although the weighing process, by its very nature, is hardly calculated to yield categorical and unchanging answers to a problem, it nonetheless does provide the fairest way we know to deal with the many-faceted aspects of legal duty. We thus believe it appropriate to resolve the duty issue in this case by balancing those factors which, to varying degrees and in different factual settings, are the focus of judicial attention in determining questions of legal duty. These factors, as particularized by the factual circumstances of this case, consist of the following: the existence of a special relationship between a psychiatrist and an involuntarily

**10.** The General Assembly in 1986 expressly provided that the statutory limitations in section 13–21–117, 6A C.R.S. (1987), which became effective only subsequent to the events in this case and restrict a psychiatrist's civil liability for failure to warn or protect others against a patient's violent behavior to those situations where the patient has communicated to the psychiatrist a serious threat of imminent physical violence against a specific person or persons, *see supra* note 8, do not apply to the negligent release of a mentally ill person. Section 13–21–117 states, in pertinent part, as follows:

The provisions of this section shall not apply to the negligent release of a mental health patient from any mental health hospital or ward or to the negligent failure to initiate

involuntary seventy-two-hour treatment and evaluation after a personal patient evaluation determining that the person appears to be mentally ill and, as a result of such mental illness, appears to be an imminent danger to others.

It is unclear whether this statutory language is intended to apply only to involuntarily committed patients or extends to voluntary inpatients. Whatever its scope, the effect of the statutory language is to render the previously mentioned exemptions from civil liability inapplicable to those situations described in the above quoted sentence. *See generally* Dice, *The Duty to Warn and the Liability of Mental Health Care Providers*, 16 Colo.Law. 70 (1987).

committed mental patient and the resulting degree of control which the psychiatrist has over the patient as a result of that relationship; the foreseeability of harm to others from the failure of the psychiatrist to take protective action for the benefit of others; the social utility of the psychiatric decision to release an involuntarily committed patient; the magnitude of the burden of guarding against violent acts committed by an involuntarily committed mental patient subsequent to release; and the practical consequences of placing that burden upon the psychiatrist.

### III.

■■■■ We turn then to consider whether Dr. Anders had a legal duty to exercise due care in determining whether Buckmaster had a propensity for violent behavior, and, if unconditionally released in that condition, would thereby present an unreasonable risk of serious bodily harm to others, including a police officer such as Officer Perriera who might encounter Buckmaster in the course of a routine police investigation. After carefully weighing the critical components of the duty complex, we are satisfied that Dr. Anders had such a legal duty under the circumstances of this case.[11]

### A.

■■■■ We first focus on the nature of the relationship between an involuntarily committed mental patient and the staff psychiatrist responsible for that patient's treatment, and the resulting degree of control reposed in the psychiatrist as a result of that relationship. We initially note that although a patient may be certified for short-term treatment under the statutory rubric of "gravely disabled," § 27–10–102(5), 11 C.R.S. (1982), it does not follow that a "gravely disabled" person might not also have a propensity for violent behavior and thus constitute a danger to others as a result of a mental illness.[12] One of the purposes of a certification for short-term treatment is to enable the psychiatrist in charge of treatment to thoroughly evaluate the patient's condition, including any danger which the patient might pose for himself or others, and to establish a treatment program calculated to address the patient's psychiatric needs and society's

---

**11.** Dr. Anders and Fort Logan argue that even if Dr. Anders had a legal duty to Officer Perreira, the doctor's decision to release Buckmaster from his involuntary commitment was a discretionary act for which he was entitled to official immunity and thus immune from liability. Under the doctrine of official immunity a public official enjoys a qualified immunity for discretionary actions—*i.e.,* those involving a judgment on a matter of policy—performed within the scope of his authority, insofar as such actions are "not willful, malicious or intended to cause harm." *Trimble v. City and County of Denver,* 697 P.2d 716, 729 (Colo.1985). We find no merit in the argument on official immunity for two reasons. First, a claim of official immunity is in the nature of a "matter constituting an avoidance or affirmative defense," and hence must be affirmatively set forth in an answer. C.R.C.P. 8(c). Dr. Anders and Fort Logan failed to plead official immunity in his answer and, in fact, entered into a written stipulation prior to trial to the effect that they were asserting no affirmative defense to the plaintiff's complaint. Second, the doctrine of official immunity applies only to discretionary actions rather than acts involving the performance of "a mandatory duty at the operational level." *Trimble,* 697 P.2d at 729. Our determination that Dr. Anders had a legal duty to exercise due care in determining whether to release Buckmaster from an involuntary commitment effectively removes the doctor's decision from the category of a "policy" judgment for purposes of the official immunity doctrine.

**12.** While a certification for short-term treatment on the basis that the mentally ill person is a danger to himself or others, § 27–10–107(1)(a), 11 C.R.S. (1982), might be indicative of a propensity for violent acts, it certainly will not always be the case. A mentally ill person may constitute a danger to himself simply by reason of his inability to adequately protect himself from the normal hazards of life and yet pose no risk of harm to others. On the other hand, a mentally ill person certified for short-term treatment on the basis that he is "gravely disabled," § 27–10–107(1)(a), 11 C.R.S. (1982), might, by reason of mental illness, also be prone to violence toward others and thus pose a significant risk of harm to others. The statutory bases for civil commitment, in other words, cannot reasonably be viewed as so mutually exclusive that a pre-commitment determination that a person is "gravely disabled" necessarily precludes a subsequent finding during the period of commitment that the person also constitutes a danger to others.

interest in protection against the violent acts of a mentally ill person. *See People v. Lane,* 196 Colo. 42, 581 P.2d 719 (1978) (recognizing as alternative justifications for civil commitment of mentally ill person either state's role as *parens patriae* in providing necessary treatment or state's exercise of police power in protecting others from potential danger).

The involuntary commitment of a mentally ill person to a state mental health facility creates a special relationship substantially different in kind from the relationship existing between a treating psychiatrist and a voluntary patient. In this case, Dr. Anders, as the staff psychiatrist in charge of Buckmaster's treatment program, had the statutory responsibility for prescribing the terms of Buckmaster's treatment program. With this statutory responsibility went the power to deny Buckmaster, for good cause, various rights granted to mentally ill persons under commitment, § 27–10–117(2), 11 C.R.S. (1982), the prerogative to terminate treatment and discharge Buckmaster when, in the doctor's opinion, he had received "sufficient benefit from such treatment for him to leave," § 27–10–110(1), 11 C.R.S. (1982), the right to seek a court order extending the term of Buckmaster's certification for short-term treatment for an additional three months, § 27–10–108, 11 C.R.S. (1982), and the authority to petition the court for long-term care and treatment if Buckmaster's mental illness was such as to continually render him either a danger to himself or others or gravely disabled, § 27–10–109(1), 11 C.R.S. (1982). In addition, Dr. Anders also had the authority to petition the court for an order depriving Buckmaster of certain legal rights upon his release, or imposing on him certain legal disabilities, consistent with Buckmaster's needs and the interest of public safety. § 27–10–125, 11 C.R.S. (1988 Supp.). This authority certainly was broad enough to encompass a petition for an order prohibiting Buckmaster from obtaining the return of his gun or possessing any other weapon upon his release, and for an order imposing such other restrictions as might significantly reduce any risk of violence by Buckmaster. The extent of control vested in Dr.

Anders over the conditions and duration of Buckmaster's involuntary commitment is sufficient to warrant a corresponding duty on the doctor's part to exercise due care, consistent with accepted psychiatric practices, in determining whether Buckmaster had a propensity for violent behavior and thus would pose an unreasonable risk of serious bodily harm to others if released. *See Merchants National Bank & Trust Co. v. United States,* 272 F.Supp. 409 (D.N.D.1967); *Durflinger,* 234 Kan. 484, 673 P.2d 86; *Evans v. Morehead Clinic,* 749 S.W.2d 696 (Ky.App.1988); *Homere,* 79 Misc.2d 972, 361 N.Y.S.2d 820; *Pangburn,* 73 N.C.App. 336, 326 S.E.2d 365; *Petersen,* 100 Wash.2d 421, 671 P.2d 230.

### B.

We next consider the foreseeability of serious bodily harm to others resulting from a psychiatrist's decision to release an involuntarily committed patient in his then existing mental condition. We acknowledge that psychiatrists cannot be expected to render precise predictions on whether a particular mental patient will engage in future acts of violence if released from an involuntary commitment. It must be borne in mind, however, that there is a significant difference between, on the one hand, forecasting future acts of violence upon the release of an involuntarily committed mental patient and, on the other, assessing that same patient's present mental condition in accordance with accepted diagnostic criteria utilized by practicing psychiatrists and determining whether that condition is such as to manifest a propensity for violence and a significant danger to others upon release.

■ A psychiatrist is not expected to render a fool-proof prediction of future violence. *Lipari,* 497 F.Supp. at 192. On the contrary, "[t]he concept of 'due care' in appraising psychiatric problems, assuming proper procedures are followed, must take account of the difficulty often inevitable in definitive diagnosis." *Hicks v. United States,* 511 F.2d 407, 417 (D.C.Cir.1975). What is required of the psychiatrist is to exercise that reasonable degree of skill and

knowledge ordinarily possessed by practicing psychiatrists in arriving at an informed and realistic assessment of the patient's present mental condition and propensity for violence so that an informed judgment can be made as to whether the release of the patient will create an unreasonable risk of serious bodily harm to others. *See Lipari*, 497 F.Supp. at 193; *Durflinger*, 234 Kan. at 490–91, 673 P.2d at 92–93; *Evans*, 749 S.W.2d at 699.

In its recent decision in *Schuster*, 144 Wis.2d at 248, 424 N.W.2d at 169, the Wisconsin Supreme Court made the point quite convincingly that psychiatrists are able to effectively evaluate dangerousness:

> [A] survey of psychotherapists suggests that practitioners are quite confident of their ability to assess dangerousness: "[T]he task of assessing dangerousness is not viewed as being beyond the competence of individual therapists or as a matter upon which therapists cannot agree." Givelber, Bowers & Blitch, [*Tarasoff, Myth and Reality: An Empirical Study of Private Law in Action*, 1984 Wis.L.Rev. 443, 486]. To hold that a psychotherapist may be held liable when it is established that he or she has negligently failed to evaluate a patient's dangerousness, or failed to take appropriate action to protect the patient and public from these qualities, is not to impose liability upon a psychotherapist for all harm caused by a patient. Rather, liability will only result where expert testimony establishes that the diagnosis or treatment was not consistent with the accepted standard of care.

The psychiatric assessment of risk associated with the release decision is substantially similar in kind to those assessments required for the certification of a patient for short-term treatment, § 27–10–107(1), 11 C.R.S. (1982), for extended short-term treatment, § 27–10–108, 11 C.R.S. (1982), for long-term care and treatment, § 27–10–109(1), 11 C.R.S. (1982), and for termination of a short-term or long-term commitment, § 27–10–110(1), 11 C.R.S. (1982). If we were to accept the argument that it is simply unfair to expect psychiatrists to foresee whether the release of an involuntarily committed patient will create an unreasonable risk of serious bodily harm to others, then we inevitably would be casting serious doubt on the reliability of virtually all phases of the commitment process. *McIntosh*, 168 N.J.Super. at 494–95, 403 A.2d at 514. Without depreciating the difficulty of psychiatric prognosis, we are satisfied that an involuntarily committed patient's propensity to violence and the corresponding risk associated with the patient's release are sufficiently foreseeable to the trained psychiatrist, using the skill and knowledge ordinarily possessed by practicing members of that profession, to impose upon the psychiatrist a duty to exercise due care in determining whether to release an involuntarily committed patient from commitment.[13]

## C.

Within the framework of the duty analysis, we next consider the social utility of a psychiatrist's decision to release

---

**13.** The evidence in the instant case points up the foreseeability of risk associated with Buckmaster's release. The plaintiff's evidence at trial showed the following: from the time of his first contact with Fort Logan in 1975 until October 1979, when he was involuntarily committed, Buckmaster's mental illness had grown increasingly worse; upon his commitment to Fort Logan in October 1979, Buckmaster was diagnosed as a paranoid schizophrenic with severe delusions of police abuse and harassment; although the effective treatment of Buckmaster's illness required antipsychotic medication, Buckmaster refused to take his medication, and Dr. Anders made no effort to obtain a court order to administer this much needed nonconsensual treatment; and Dr. Anders, with knowledge of Buckmaster's prior hospitalizations for mental illness, his ongoing delusion about police harassment and recent contacts with the police, his access to a gun upon termination of treatment, and his need for but refusal to take his antipsychotic medication during the term of his commitment, made the decision to terminate Buckmaster's treatment prior to the expiration of the ninety-day term of commitment and in the absence of an adequate assessment of whether Buckmaster's release would create a danger to others. Both of the plaintiff's expert witnesses testified that Buckmaster's history of behavioral disorders and his psychiatric symptoms at the time of his release were such as to indicate to a trained psychiatrist a significant potential for violence and a serious risk of harm to others.

a mentally ill person from an involuntary commitment. One of the express goals of Colorado's statutory program for the care and treatment of the mentally ill is to restrict the deprivation of a mentally ill person's liberty interests to those situations where "less restrictive alternatives are unavailable and only when [the mentally ill person's] safety or the safety of others is endangered." § 27–10–101(1)(b), 11 C.R.S. (1982). With this goal in mind, the General Assembly has reposed in a psychiatrist who is responsible for the treatment of an involuntarily committed patient the authority to terminate treatment as soon as in the psychiatrist's opinion the person "has received sufficient benefit from such treatment for him to leave." § 27–10–110(1), 11 C.R.S. (1982). This statutory authority, however, does not contemplate that the decision to release an involuntarily committed patient may be made without regard to the safety of others. On the contrary, the psychiatrist responsible for the treatment of such patient is expected to balance the various therapeutic considerations concerning the patient's condition against the public dangers reasonably apparent from releasing the patient in his present condition. In short, the commendable goal of restoring mentally ill persons to an active and productive life, or even a moderate level of self-sufficiency, does not serve to relieve a treating psychiatrist of the concomitant responsibility to adequately consider the public interest in releasing an involuntarily committed patient whose condition might render him a present danger to the safety of others. *See Lipari*, 497 F.Supp. at 192; Note, *Psychiatrists' Liability to Third Parties for Harmful Acts Committed by Dangerous Patients*, 64 N.C.L.Rev. 1534 (1986).

### D.

■■■■ We next focus on the magnitude of any burden that might devolve upon a psychiatrist by virtue of a legal duty of due care in determining whether to release a mentally ill person from an involuntary commitment. The measure of this burden, in our view, amounts to no more than exercising reasonable care, in accordance with the skill and knowledge ordinarily possessed by practicing psychiatrists, in arriving at an informed decision on the propriety of releasing an involuntarily committed patient and, if released, the conditions and restrictions placed on the release. Any burden inherent in such duty will come into play only when the psychiatrist, again in accordance with the professional standards of psychiatric practice, knows or has reason to know that the involuntarily committed patient has a propensity for violence and thus presents an unreasonable risk of serious bodily harm to others. *See* George, Korin, Quattrone & Mandel, *The Therapist's Duty to Protect Third Parties: A Guide for the Perplexed*, 14 Rutgers L.J. 637, 641–44 (1983). Clearly, if the patient does not manifest a propensity for violent behavior and there is no reason to believe that the patient will become violent after release, the psychiatrist will not have breached a legal duty in releasing the patient even though the patient might later engage in violent conduct toward others. So also, if a patient manifests what might appear to be violent propensities, but the psychiatrist conducts a thorough evaluation of the patient's mental condition and dangerousness and then makes a good faith decision, in accordance with accepted psychiatric practices, that the patient does not have a propensity for violence and releases the patient, the psychiatrist will have complied with his legal responsibility. Moreover, even if the patient is diagnosed as having a propensity for violence, the psychiatrist will not be liable under the theory of negligent release if, after a thorough evaluation of the patient's condition and a balancing of the patient's interests and the interests of potential victims, the psychiatrist rejects an extended term of commitment as a feasible form of treatment and makes a good faith decision to release the patient under a psychiatrically acceptable treatment program and other conditions reasonably calculated to protect potential victims from acts of violence. *See generally Littleton*, 39 Ohio St.3d at 99, 529 N.E. 2d at 460.

In our view, the burden placed on a psychiatrist by the requirement of due care in releasing an involuntarily committed patient is certainly not so formidable as to relieve the psychiatrist of any and all legal responsibility in arriving at that decision. Within the broad range of accepted diagnostic criteria and treatment, the psychiatrist "is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence." *Tarasoff*, 17 Cal.3d at 438, 511 P.2d at 345, 131 Cal.Rptr. at 25.

### E.

We turn our attention to the practical consequences of imposing a duty of due care upon the psychiatrist in determining whether to release a person from an involuntary commitment. The argument is made that recognition of a duty under the circumstances of this case will result in the overcommitment of mentally ill patients to institutional care and thus frustrate the goal of placing such patients in the least restrictive environment. *See* Note, *Imposing A Duty to Warn on Psychiatrists—A Judicial Threat to the Psychiatric Profession*, 48 U.Colo.L.Rev. 283, 297–301 (1977). This argument is speculative at best and is unsupported by any reliable statistical data. *See McIntosh*, 168 N.J.Super. at 496, 403 A.2d at 515. Separate and apart from this deficiency, we believe that the underlying assumption of the "overcommitment" argument was addressed and answered by the court in *Lipari*, 497 F.Supp. 185, as follows:

This argument misinterprets the nature of the duty imposed upon the therapist. The recognition of this duty does not make the psychotherapist liable for any harm caused by his patient, but rather makes him liable only when his negligent treatment of the patient caused the injury in question.

Modern psychiatry has recognized the importance of making every reasonable effort to return a patient to an active and productive life. Thus, the patient is encouraged to develop his self-confidence by adjusting to the demands of everyday existence. In this view, mental hospitals are not seen as dumping grounds for all persons whose behavior society might find inconvenient or offensive; institutionalization is the exception, not the rule, and is called for only when a paramount therapeutic interest or the protection of society leaves no choice.

\* \* \* \* \* \*

On the other hand, despite the therapeutic benefits of this "open door" approach, the practice admittedly entails a higher potential of danger both for the patient and for those with whom he comes in contact. In deciding the extent to which a patient should be released from restrictions, the treating physician must exercise his judgment and balance the various therapeutic considerations together with the possible dangers.

Thus, despite the defendant's protests to the contrary, a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risks of such a placement. This duty is no greater than the duty already owing to the patient.

497 F.Supp. at 192–93 (citations omitted).[14]

No one can reasonably dispute the proposition that it would be contrary to both the

**14.** An additional argument often raised is that the imposition of a legal duty of due care upon a psychiatrist to take reasonable measures to protect others from the violent acts of a voluntary patient will discourage psychiatrists from treating dangerous patients. In addressing this concern, the Wisconsin Supreme Court in *Schuster v. Altenberg*, 144 Wis.2d 223, 260, 424 N.W.2d 159, 174–75 (1988), observed that "data collected in a survey of the impact of *Tarasoff* demonstrated that *Tarasoff* has not discouraged therapists from treating dangerous patients,'" citing Givelber, Bowers & Blitch, *Tarasoff, Myth and Reality: An Empirical Study of Private Law in Action*, 1984 Wis.L.Rev. 443, 486). Moreover, again on the basis of Givelber, Bowers & Blitch article, the court noted that the "imposition of a duty to protect third persons from the violent propensities of a patient has been found to be consistent with the ethical obligations perceived by psychotherapists to govern their behavior

interest of the patient and the interest of society to release an involuntarily committed patient from institutional care when such release, as a result of the patient's propensity for violent behavior and continuing mental illness, would endanger the safety of the patient, the safety of the public, or perhaps both. In a very real sense, the practical consequences of recognizing a duty of due care under the circumstances of this case amount to no more than imposing on the psychiatrist a responsibility commensurate with that which can reasonably be expected of a psychiatric practitioner in treating an involuntarily committed patient and no less than that to which the public is entitled.

■ In conclusion, we hold that Dr. Anders had a legal duty to exercise due care in determining whether Buckmaster had a propensity for violence and, if released from his involuntary commitment, would thereby present an unreasonable risk of serious bodily harm to others, including a police officer in the position of Officer Perreira at the time of his death. We further hold that if indeed Dr. Anders knew or should have known, in accordance with the knowledge and skill ordinarily possessed by psychiatric practitioners under similar circumstances, that Buckmaster had a propensity for violence and thus presented an unreasonable risk of serious bodily harm to others, then Dr. Anders was obliged to take reasonable precautions to protect members of the public from the danger created by Buckmaster's release, including the giving of due consideration to extending the term of Buckmaster's commitment or to placing appropriate conditions and restrictions on Buckmaster's release consistent with his needs and the safety of the public.

### IV.

■ Since the existence and scope of legal duty is a question of law and we have ruled in favor of the plaintiff on that issue, and since the breach of legal duty is a question of fact for the jury and the jury has found in favor of the plaintiff on that

issue, we arguably could resolve this case by simply reversing the judgment of the court of appeals and ordering the reinstatement of the judgment entered on the jury verdict. We decline to do so, however, for several reasons, which in their totality point to the need for a new trial in the interest of fairness.

When this case was tried, there was no definitive law in this jurisdiction on whether a staff psychiatrist such as Dr. Anders could be held answerable in tort for the violent act of a mentally ill person whom the doctor had recently released from an involuntary commitment. There was considerable uncertainty not only as to the existence of a legal duty but also as to the scope of any such duty and the appropriate method of discharging that duty. As a result of that uncertainty, the parties were at a considerable disadvantage in marshalling evidence in support of and in defense of a claim which might or might not be legally cognizable and, if legally cognizable, might or might not encompass the particular circumstances of this case.

Although the trial court ruled at the end of the plaintiff's case, and again at the conclusion of the evidence, that Fort Logan and Dr. Anders had a legal duty to protect others such as Officer Perreira from harm, it never articulated that duty for the benefit of the parties or the jury. Instead of instructing the jury on Dr. Anders' duty to exercise due care in determining whether Buckmaster had a propensity for violence and whether Buckmaster would thereby present an unreasonable risk of harm to others if unconditionally released from commitment, the trial court merely told the jury that Dr. Anders in treating Buckmaster was obligated to use the skill and knowledge possessed by other practitioners in the same field of expertise. Finally, the jury was never informed that Dr. Anders could appropriately discharge his duty by taking reasonable precautions to protect others from the danger created by the release of Buckmaster, including the giving of due consideration to extending the term

notwithstanding any legal obligation." 144 Wis. 2d at 260–61, 424 N.W.2d at 175.

of the commitment or to placing appropriate conditions and restrictions on Buckmaster's release.

In light of the record before us, we are satisfied that the interests of fairness require a new trial. The judgment of the court of appeals is accordingly reversed and the case is remanded to that court with directions to return the case to the district court for a new trial consistent with the views herein expressed.

VOLLACK, J., dissents.

ERICKSON and ROVIRA, JJ., join in the dissent.

VOLLACK, Justice, dissenting:

I dissent from the majority opinion because I would hold as a matter of law that Dr. Anders and the state did not owe a legal duty to Officer Perreira under these circumstances. While I do not agree entirely with the court of appeals' analysis, I would affirm the court of appeals' conclusion that "the trial court erred in finding that the State had a legal duty to Officer Perreira and his survivors." *Perreira v. State*, 738 P.2d 4, 6 (Colo.App.1986).

## I.

### Negligent Release

The plaintiff's claim is not that Dr. Anders negligently failed to warn Officer Perreira, or police officers in general, of alleged threats by Buckmaster. Rather, the claim is that Dr. Anders negligently released Buckmaster from his involuntary mental health commitment at Fort Logan Mental Health Center (FLMHC) and, presumably, that this alleged negligence was the proximate cause of Officer Perreira's death four months later. I agree with the majority that traditional tort analysis applies to the issue of negligent release, incorporating foreseeability and other factors into the larger question of duty. I do not agree, however, that the determination of duty rests so heavily on Buckmaster's classification as an involuntarily committed inpatient. At 1212–1214. *Littleton v. Good Samaritan Hosp. & Health Center*, 39 Ohio St.3d 86, 90, 529 N.E.2d 449, 453 (1988) (The plaintiff, administrator of the victim's estate, alleged that the negligence of the physician and hospital in releasing the patient from the hospital was the proximate cause of the death of the patient's daughter. The patient's hospitalization was voluntary but the court held: "Even though Theresa was a voluntary patient, we find that Dr. Murray had sufficient charge of Theresa in the hospital setting such that a special relation was established." *Id.* at 92, 529 N.E.2d at 455.).

Instead, I would focus on the distinction between negligent release of a patient, and failure to warn persons who might foreseeably be injured. Other jurisdictions have recognized this distinction. *See Soutear v. United States*, 646 F.Supp. 524, 532 (E.D. Mich.1986) (applying Michigan law) ("Plaintiff's claim is based on two theories of negligence. First, that the doctors at the Allen Park VA hospital were *negligent in releasing* [the patient] because he posed a risk of violence to his parents, and second, that the doctors *negligently failed to warn* the [parents] that they were potential victims." (Emphasis added.)); *Durflinger v. Artiles*, 234 Kan. 484, 485, 673 P.2d 86, 89 (1983) ("Would the Kansas Supreme Court recognize as a valid cause of action a claim which grew out of a *negligent release* of a patient who had violent propensities, from a state institution, *as distinguished from negligent failure to warn* persons who might be injured by the patient as the result of the release?" (Emphasis added.)); *see also Tarasoff v. Regents of the Univ. of Cal.*, 17 Cal.3d 425, 431, 131 Cal.Rptr. 14, 20, 551 P.2d 334, 340 (1976) ("Plaintiffs' complaints predicate liability on two grounds: defendants' *failure to warn* plaintiffs of the impending danger and their *failure to bring about Poddar's confinement....*" (Emphasis added.)). *See generally* Annotation, *Liability of One Releasing Institutionalized Mental Patient for Harm He Causes*, 38 A.L.R.3d 699 (1971).

## II.

### Duty

#### A. Foreseeability

Traditional tort analysis requires the existence of a duty, breach of the duty, a

showing that this breach was the proximate cause of the plaintiff's injuries,[1] and damage. The question whether there is a duty owed by the defendants to the plaintiff is a question of law. *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987). "Where a person should reasonably foresee that his act, or failure to act, will involve an unreasonable risk of harm to another, there is a duty to avoid such harm." This duty extends to a third person if there is "a special relation between the actor and the wrongdoer or between the actor and the victim." *Leake v. Cain,* 720 P.2d 152, 160 (Colo.1986); *Restatement (Second) of Torts* § 315 (1965).

### 1.

"[F]oreseeability alone does not establish the existence of a duty." *Taco Bell,* 744 P.2d at 49. While a duty may arise if foreseeability has been established, other factors also enter into the legal determination of whether a duty exists. *Id.* at 49 n. 6. These factors may include but are not limited to " 'the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the [defendant's] conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the [defendant].' " *Id.* at 46 (quoting *Smith v. City & County of Denver,* 726 P.2d 1125, 1127 (Colo.1986)).

Other jurisdictions have specifically analyzed foreseeability in the mental health setting in determining whether a legal duty existed.

> [A] hospital may be held liable for the negligent release of a mental patient only when the hospital, in exercising medical judgment, knew or should have known that the patient, upon his release, would be very likely to cause harm to himself or others. Such likelihood must be more than a mere possibility and not based on hindsight.

*Leverett v. State,* 61 Ohio App.2d 35, 41, 399 N.E.2d 106, 110 (1978). "A claim of negligence [in discharging a patient] must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them." *Hicks v. United States,* 511 F.2d 407, 415 (D.C. Cir.1974); *see Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980) (applying Nebraska law) ("[T]he Nebraska Supreme Court would ... limit the therapist's liability to *those persons foreseeably endangered* by the V.A.'s negligent conduct.... [T]he plaintiffs ... must prove that the risk created by the V.A.'s negligence was such that, under the circumstances, the V.A.'s employees could have reasonably foreseen an unreasonable risk of harm to the Liparis or a class of persons of which the Liparis were members." *Id.* at 194–95 (footnote and citations omitted) (emphasis added).); *Cain v. Rijken,* 74 Or. App. 76, 80, 700 P.2d 1061, 1064 (1985) ("[I]f Providence [Medical Center] had knowledge of Rijken's illness, past actions and condition at the time of the injury, it would have notice that reckless driving could be *a foreseeable consequence* of Rijken's disease." (Emphasis added.))

In assessing foreseeability, most cases rely heavily on a patient's known "violent propensity." *Durflinger v. Artiles,* 234 Kan. at 485, 673 P.2d at 89. In *Durflinger,* the patient had previously attacked his relatives "armed with a hatchet and a meat fork [with the] intention to kill his grandparents and steal their automobile." *Id.* at 485, 673 P.2d at 90. The patient "was committed to the hospital because he was dangerous to other persons." *Id.* at 486, 673 P.2d at 93. In *Pangburn v. Saad,* 73 N.C.App. 336, 326 S.E.2d 365 (1985), the patient was involuntarily committed after he was examined and found to be "suicidal, dangerous to himself and others, and to have threatened physical harm to his family and others." *Id.* at 347, 326 S.E.2d at

---

**1.** I disagree with the majority's finding that Dr. Anders had a duty and breached that duty. Even if there was a duty, however, I cannot agree with the implicit conclusion that there was a causal relationship between Buckmaster's release on December 11, 1979, and his violent act on April 1, 1980. Even if Dr. Anders had not permitted Buckmaster's release from the facility in December 1979, Buckmaster's short-term involuntary commitment would have expired on January 18, 1979, two and one-half months before Officer Perreira was killed.

372. In *Homere v. State*, 79 Misc.2d 972, 361 N.Y.S.2d 820 (1974), the patient's records contained "innumerable entries relating to acts of aggression, clearly evincing that he was an extremely violent, assaultive man, who attacked females without reason, cause or justification." *Id.* at 974, 361 N.Y.S.2d at 822. In *Williams v. United States*, 450 F.Supp. 1040 (D.S.D. 1978) (applying Federal Tort Claims Act), the court held that the hospital had a duty to notify county authorities of the patient's release because the patient "had to be placed in the locked wards of VA hospitals because of violent behavior and threatened violence." *Id.* at 1041. "[The patient] Alonzo Bush initiated, threatened or was involved in several fights, threatened to kill members of his own family, made oral threats of violence toward hospital staff and police, [and] threatened a VA doctor with a scissors...." *Id.* at 1041 n. 1.

2.

Here, the record does not show that Buckmaster had a known violent propensity. The first time Buckmaster was hospitalized at Fort Logan Mental Health Center was in February 1975, when he was treated for about two months. He was hospitalized in a Kansas Veteran's Administration Hospital for approximately six months in 1976. Buckmaster was not seen again at FLMHC until May 1979. This contact arose from Buckmaster's alleged "beating" of his father. Dr. Vollman questioned Buckmaster's sister, who was present during this incident. She told Dr. Vollman that "the father threw an ashtray at the patient and the patient kicked the father, [and] there was a screaming and shouting as well." After a seventy-two-hour hold and evaluation it was determined that Buckmaster was not dangerous to himself or others and was not gravely disabled. He was released. In August 1979 Buckmaster underwent another seventy-two-hour hold and evaluation. Again it was determined that, although mentally ill, Buckmaster was not gravely disabled or a danger to himself or others. In October 1979, however, Buckmaster was evaluated as gravely disabled and certified for short-term care and treatment.

Dr. Vollman was Buckmaster's clinical psychologist at FLMHC throughout his treatments in 1975 and 1979. She was on the "treatment team" that was treating Buckmaster. Dr. Anders was the head of the team. A report prepared by Dr. Vollman showed that in May 1979, Buckmaster's sister reported to FLMHC that Buckmaster had "become increasingly withdrawn" and was "showing no regard for his personal appearance." Buckmaster's sister also explained that Buckmaster and his father "had had a continuing feud from the time that [Buckmaster] was a teenager until this time in his life." Dr. Vollman testified that "[the police] were one of a number of group[s] of people who[m] he felt were causing him difficulty."

When Dr. Vollman saw Buckmaster in August 1979 she said that "instead of believing that there was a general class of people who were trying to make life difficult for him, officials, friends, family, police, he still was as much concerned about car mechanics and what they were doing to his car" because he believed that "[the police] and car mechanics were making his vehicle difficult to operate."

When Buckmaster was admitted to FLMHC in October 1979, Dr. Vollman said "there was a very striking difference" in his condition; that he came to his interview "filthy, [and] smelling" and that his "thinking was much more disorganized." By this time Buckmaster was "spending almost all the time sleeping on the streets, on the sidewalks, in doorways, or staying in all-night restaurants." Dr. Vollman explained that Buckmaster had "not had a bath for quite some time" and that he told her "he would go for forty-five days without eating." She summarized: "If we look at how he has changed between May and October, clearly in May he was much more able to take care of himself, to feed himself, to bathe himself, to find shelter." This inability to care for himself was the basis for his involuntary admission as a gravely disabled mentally ill individual.

Between October and December 1979 Buckmaster was an inpatient at FLMHC and underwent therapy there. Even the plaintiff's psychiatric expert testified that Buckmaster's condition improved during this time, despite his refusal to voluntarily take medication. On December 11, Dr. Vollman determined that Buckmaster "no longer had the criteria for being an involuntarily [sic] patient according to the law" and told him that if he did not want to remain at the hospital as a voluntary patient she "had no choice but to let him go." On December 11 she noted that " '[s]ince patient refuses all treatment[2] which might significantly alter his condition, improvement at this time is probably maximal.' "

Dr. Sundell testified as an expert for the plaintiff. Dr. Sundell's testimony was that Doctors Anders and Vollman failed to make a sufficient evaluation of Buckmaster "as to whether in fact he was or was not certifiable on the grounds of being dangerous to himself or others at that particular time."

Dr. Vollman testified that Buckmaster "never committed an act of violence, unless we look at the time he kicked his father in the shins." She described their evaluation of Buckmaster in this way:

[A Dr. Vollman:] And on no occasion—and we specifically and very directly asked him about his plans and feelings—did he feel like hurting these people, particularly the police who were trying to mess around with his life, and he absolutely denied that.

Q Can you give us some examples of how you did explore that with Mr. Buckmaster?

A We certainly asked him direct questions about that: Do you have any plans? Have you ever thought of hurting anybody?

But we certainly asked him clearly and carefully: What kind of violent behavior have you engaged in in the past? Have you ever hurt anybody? Have you ever gotten into a barroom fight? Have you ever hurt anybody with a gun? Since you have owned a gun, have you ever shot at anybody? Have you ever hurt anybody with that?

His answer to all of these questions was, "No." In fact, the information he gave me was that he had never even shot the gun that he owned.

Q Did you do anything to corroborate any of the information or to check it out to see if Mr. Buckmaster was telling you the truth?

A All of my phone calls to—I called the Englewood Police Department, the Littleton Police Department, Aurora Police Department, Glendale Police Department, attempting to get information from them if in fact he had ever been arrested for a violent crime, and their answer was, "No."

I talked to his sister and very specifically asked her if she was aware of the fact that he owned a gun. Had he ever hurt anybody with it? Did she know, or did any of the other relatives who had talked to her about his recent behavior—by "recent" I mean from 1977 to 1979—were they aware of any time he had ever hurt anyone, and she said, no, that as far as she knew, the only violent act was to kick his father in the shins.

We tried also to get information from the Veterans' Administration Hospital, and even though we were unsuccessful in getting detailed records from them, the Mental Health Center was willing to share, at least read some parts of the records they had from the Veterans' Administration Hospital to us.

So, to the best of my knowledge, he had never committed a violent act in the past.

Q Did the information the V.A. Hospital gave you relate in any way to violence?

A We asked very specifically, were they aware—had he come into the hospital as a result of a violent act, or had he hurt anybody that was in the hospital. That was one thing that seemed very

---

**2.** Dr. Vollman explained that she "was basically referring to medications."

important for us to know the first time he came in, and they said, no.

Dr. Anders also testified that the "only episode [of violence] I know is when his father threw an ashtray at him, and that altercation occurred prior to his first admission."

Dr. Sundell conceded "changes and improvement" in Buckmaster's condition during his hospitalization from October to December 1979 despite the fact that he refused medication. When Buckmaster was released from FLMHC in December 1979 he was 46 years old and had "[n]o significant history" of alcohol or drug abuse. At the time of his release, his arrest history was limited to charges of loitering, trespassing, carrying a concealed weapon, and driving with a suspended license. On cross-examination this exchange took place:

Q. [defense counsel] Finally, doctor, am I correct that it is not your opinion ... based on a reasonable degree of medical probability that on December 14th, 1979, Doctor Vollman, Doctor Anders or anyone at Fort Logan Mental Health Center should have known that Mr. Buckmaster was likely to kill Officer Perreira or anyone else?

A. [Dr. Sundell] Oh, absolutely, there is no way they could have known that.

On redirect examination he was asked: "do you have an opinion based upon a reasonable degree of medical certainty as to the probability of Mr. Buckmaster causing harm to others in the future?" He replied: "Based upon the deteriorating condition of his mental illness, the absence of antipsy-chotic medication, it was foreseeable that some harm would occur."

Much significance is placed on Buckmaster's possession of a gun. It is undisputed, however, that Buckmaster had possessed this gun from 1975 until 1979, and that he told Dr. Vollman he had never used it. Buckmaster's explanation was that he kept the gun with him because he feared for his safety when he was living in and sleeping in his car.

In the absence of a known violent propensity, I cannot agree that under these circumstances a gravely disabled patient—one who was involuntarily committed because he was unable to care for himself, not because he was dangerous to himself or others—can be considered to have presented a foreseeable risk of danger to others four months after his release from commitment.[3] The majority premises its analysis on Buckmaster's imminent danger to others as a result of his mental illness.[4] At 1215–1216. I disagree with this premise, as the short-term certification in question was based on the psychiatrist's determination that Buckmaster was gravely disabled, not that he presented an imminent danger to himself or to others. I cannot agree that the classification of Buckmaster as "gravely disabled," as opposed to dangerous to himself or others, is without meaning. If that were so, the classification scheme of Colorado's mental health statutes would likewise be meaningless. See §§ 27–10–102(5)[5] & –107(1)(a), 11 C.R. S. (1982).

Liability for negligent release has generally been found to apply in other jurisdic-

3. The "specific threats to specific victims" limitation has been applied by some jurisdictions in failure to warn cases, and serves to protect the public or members of the public when protection is appropriate under the circumstances. See Thompson v. County of Alameda, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980). See generally Annotation, Liability of Governmental Officer or Entity for Failure to Warn or Notify of Release of Potentially Dangerous Individual from Custody, 12 A.L.R.4th 722 (1982).

4. Mental health professionals never disputed that Buckmaster was mentally ill. At some points in time his mental illness was described as being in remission, while at other times he was "gravely disabled" and unable to care for himself.

5. The statute provides this definition.
"Gravely disabled" means a condition in which a person, as a result of mental illness, is unable to take care of his basic personal needs or is making irrational or grossly irresponsible decisions concerning his person and lacks the capacity to understand this is so. A person of any age may be "gravely disabled" under this definition, but the term does not include mentally retarded persons by reason of such retardation alone.
§ 27–10–102(5), 11 C.R.S. (1982).

tions under different factual situations. A case in which a psychiatrist performs an evaluation of a patient and exercises his or her professional judgment, for example, should be distinguished from a case in which "there was a failure to evaluate the condition of potentially dangerous patients before discharging them from the hospital." *Littleton*, 39 Ohio St. at 96, 529 N.E.2d at 458. Negligent release may also occur when "there was a failure to keep detailed and proper medical notes and, consequently, *it could not be established whether any evaluation* of the patient's suicidal propensities *had been made* by a qualified psychiatrist." *Id.* (emphasis added).

### B. Other Factors

Other factors which are appropriate for consideration of whether a legal duty arises are " 'the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the [defendant's] conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the [defendant].' " *Taco Bell*, 744 P.2d at 46 (quoting *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo. 1986)). Many policy considerations are presented here. It has been argued that "the imposition of a broad duty upon psychotherapists would severely hinder the practice of mental health treatment." *Brady v. Hopper*, 570 F.Supp. 1333, 1337 (D.Colo.1983), *aff'd*, 751 F.2d 329 (10th Cir. 1984). The rule proposed by the majority "would closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment." *Id.* at 1339. Imposing this duty to warn on psychiatrists "arguably will make 'treatment of dangerous patients more difficult, thereby increasing the risk of violence in our society.' " Kallianos, *Psychiatrists' Liability to Third Parties for Harmful Acts Committed by Dangerous Patients*, 64 N.C.L.Rev. 1534, 1545 (1986) (quoting Note, *Psychiatrists' Duty to Protect Foreseeably Endangered Third Parties—Petersen v. State*, 100 Wash.2d 421, 671 P.2d 230 (1983), 18 Suffolk U.L.Rev. 879, 883 (1984))).

A seemingly irreconcilable conflict arises when one attempts to balance the express policy of Colorado's mental health statutes favoring release of mental patients, section 27-10-101, 11 C.R.S. (1982 & 1988 Supp.), and the seemingly unlimited potential liability now imposed on mental health professionals by the majority when a professional judgment call is made permitting release of a patient. *See Brady*, 570 F.Supp. at 1337 & n. 4. "If a psychiatrist knows that he will face liability for failing to foresee a patient's future violent behavior, the predictable result will be a court-mandated end to 'out-patient' treatment, and the massive confinement of all patients who display even a remote possibility of violent behavior." *Littleton v. Good Samaritan Hosp. & Health Center*, 39 Ohio St.3d 86, 94, 529 N.E.2d 449, 456–57 (1988) (footnote omitted).

As an alternative to the malpractice standard of ordinary care and the "professional judgment standard," *see Bell v. New York City Health & Hospitals Corp.*, 90 A.D.2d 270, 456 N.Y.S.2d 787 (1982), and *Currie v. United States*, 644 F.Supp. 1074 (M.D.N.C. 1986), *aff'd on other grounds*, 836 F.2d 209 (4th Cir.1987), the Ohio Supreme Court has formulated its own three-part test.

[W]e hold that a psychiatrist will not be held liable for the violent acts of a voluntarily hospitalized mental patient subsequent to the patient's discharge if (1) the patient did not manifest violent propensities while being hospitalized and there was no reason to suspect the patient would become violent after discharge, or (2) a thorough evaluation of the patient's propensity for violence was conducted, taking into account all relevant factors, and a good faith decision was made by the psychiatrist that the patient had no violent propensity, or (3) the patient was diagnosed as having violent propensities and, after a thorough evaluation of the severity of the propensities and a balancing of the patient's interests and the interests of potential victims, a treatment plan was formulated

in good faith which included discharge of the patient.

*Littleton*, 39 Ohio St.3d at 99, 529 N.E.2d at 460. I believe that this test successfully accommodates the competing concerns in this area, and would adopt it as the test in Colorado.

My review of the record requires me to conclude that the facts do not support the finding of a legal duty by Dr. Anders and the State to Perreira.[6] By failing to establish the existence of a such a duty, the plaintiff has not made the required showing of a prima facie case of negligence. *Leake*, 720 P.2d at 163. Fort Logan Mental Health Center and Dr. Anders filed motions to dismiss at the conclusion of the plaintiff's case and at the conclusion of all the evidence, asserting that Dr. Anders had no legal duty to Perreira. The trial court denied the motions. For the reasons discussed, I would hold that the trial court erred in denying the motions to dismiss the claims against Dr. Anders and the State of Colorado. As a matter of law, the two remaining defendants did not have a duty of the type asserted by the plaintiff.

I am authorized to say that Justice ERICKSON and Justice ROVIRA join in this dissent.

---

**6.** Other jurisdictions have taken an even more extreme position in protecting professional judgment decisions made in the mental health area. Similar facts were presented in *Sherrill v. Wilson*, 653 S.W.2d 661 (Mo.1983), where an involuntarily committed patient was permitted to leave the facility on a two-day pass; during that time, he shot a person eleven times with rifle. The Missouri Supreme Court held:

[T]he defendant physicians *should not be held liable for even foreseeable civil damages simply because they might be found to have exer-*

*cised negligent professional judgment in permitting him to leave the premises.* The decision to hold a person against his will is a very serious one, especially when the detainee has not been convicted of a crime. We believe that an "actual holding of liability would have worse consequences than the possibility of actual mistake."

*Sherrill*, 653 S.W.2d at 667 (emphasis added) (quoting 2 F. Harper & F. James, *The Law of Torts* § 29.10 (1956)).