**Eric DAVENPORT, Plaintiff–Appellee and Cross–Appellant,**

v.

**COMMUNITY CORRECTIONS OF THE PIKES PEAK REGION, INC., Defendant–Appellant and Cross–Appellee.**

No. 94CA1283.

Colorado Court of Appeals, Div. II.

Jan. 9, 1997.

As Modified on Denial of Rehearing March 6, 1997.

Certiorari Granted Sept. 8, 1997.

Roberta Earley, Drew Moore, Colorado Springs, for Plaintiff–Appellee and Cross–Appellant.

Hall & Evans, L.L.C., Alan Epstein, Jeffery B. Stalder, Denver, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge ROTHENBERG.

In this negligence action, defendant, Community Corrections of the Pikes Peak Region, Inc., (Pikes Peak) appeals the judgment entered on a jury verdict finding it liable to plaintiff, Eric Davenport, for injuries he sustained in an automobile accident. Davenport cross-appeals limitations on his damages and the partial denial of his motion for payment of costs. We reverse the judgment in favor of Davenport and remand with directions to dismiss the complaint.

Pikes Peak is a private not-for-profit corporation that operates a halfway house community corrections facility under a contract with the Division on Criminal Justice of the Colorado Department of Public Safety.

On January 14, 1989, Fred Rutledge, who was then a resident of Pikes Peak's diversion program, was permitted to leave the facility on a weekend pass. Rutledge and Davenport were friends and gathered with other friends to socialize and drink. After Rutledge became intoxicated, he and Davenport left the gathering, and Davenport willingly got into Rutledge's car.

With Rutledge driving and Davenport the passenger, the two drove to a nearby liquor store to buy more beer. Rutledge lost control of his vehicle, it crashed, and Davenport suffered permanent debilitating injuries as a result of the accident.

Davenport later filed this action against Pikes Peak contending that: (1) it negligently had failed to follow statutory directives and its own policies with regard to Rutledge; and (2) Pikes Peak's failure to follow those procedures caused the accident in which he was injured. Pikes Peak designated Rutledge as a non-party at fault pursuant to § 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A).

At trial, the jury found Pikes Peak liable for 90 percent of Davenport's injuries and Rutledge liable for 10 percent of the injuries. It then assessed total economic damages at $435,000, damages for disfigurement at $10,000, and non-economic damages at $1,468,-

000. The trial court reduced Davenport's non-economic damages to $250,000, entered judgment for him against Pikes Peak in the amount of $625,500, and awarded him costs.

## I. Duty

Pikes Peak first contends the trial court erred in determining that it had a duty to protect Davenport from Rutledge's dangerous behavior. We agree.

The elements of a negligence action consist of a legal duty, a breach of the duty, causation, and damages. *Casebolt v. Cowan*, 829 P.2d 352 (Colo.1992). A negligence claim fails when it is based on circumstances for which the law does not impose a duty. *Greenberg v. Perkins*, 845 P.2d 530 (Colo. 1993).

In determining whether the law imposes a duty on a defendant, several factors are relevant, including: the risks involved, the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury or harm, and the consequences of placing the burden on the defendant. *Taco Bell, Inc. v. Lannon*, 744 P.2d 43 (Colo.1987).

Whether a defendant owes a plaintiff a duty to act or refrain from acting in order to avoid injury is a question of law determined by the court. *Casebolt v. Cowan, supra.*

Here, in a pretrial order, the trial court determined that Pikes Peak owed a duty to Davenport, but did not clarify whether the duty was based on statutory or common law grounds. Pikes Peak asserts that neither basis supports the imposition of a duty here. We agree.

### A. Statutory Duty

Pikes Peak asserts, that the statutes governing the community corrections process did not impose a duty upon Pikes Peak. We agree.

Before a private tort remedy is available against a nongovernmental defendant for violating a statutory duty, a plaintiff must

show that: (1) he or she is a member of the class intended to be benefitted by the statute and (2) the injury suffered by the plaintiff is of the type the statute was designed to prevent. *Lyons v. Nasby,* 770 P.2d 1250 (Colo. 1989); *see also Allstate Insurance Co. v. Parfrey,* 830 P.2d 905 (Colo.1992); *Largo Corp. v. Crespin,* 727 P.2d 1098 (Colo.1986).

■ In construing statutes, we first examine the statutory language itself, giving words and phrases their commonly accepted and understood meaning. *Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049 (Colo. 1995). Statutes relating to the same subject matter should be construed together to give effect to the legislative intent. *See R.E.N. v. Colorado Springs,* 823 P.2d 1359 (Colo.1992) (fn.5).

■ The legislative declaration for the community corrections statutes in effect at the time of the accident contained the following pertinent language:

(1) It is the purpose of this article to encourage flexibility in the development of community correctional facilities and programs by the department, units of local government, and nongovernmental agencies and to encourage the use of such facilities and programs by sentencing courts. It is the further purpose of this article to provide a procedure through which units of local government and nongovernmental agencies may provide adult services to the department and to sentencing courts.

(2) It is the intent of the general assembly that community correctional facilities and programs be used to *protect the public safety* by serving the following purposes:

(a) With respect to offenders sentenced to community corrections by the courts, to provide a sentencing option and to increase the potential for ... offender access to rehabilitation programs....

Colo. Sess. Laws 1987, ch. 331, § 17–27–101 at 1824 (1st Regular Session Supp.) (emphasis added).

Another section in the community corrections statutes provided directions for administrators of community corrections facilities when reporting residents' violations of their sentencing conditions. At the time of the automobile accident, that section provided:

Where the administrator of a community correctional facility or any other appropriate supervision authority has cause to believe that any offender placed in a community correctional facility has violated any rule or condition of his placement in that facility ... or cannot be safely housed in that facility, the administrator ... shall certify to the appropriate judicial or executive authorities the facts which are the basis for his belief and execute a transfer order ... to transport the offender to the county jail in the county in which the facility is located where he shall be confined pending a determination by the appropriate court or executive authorities as to whether or not the offender shall remain in community corrections.

Colo. Sess. Laws 1984, ch. 128, § 2 at 529–30 (presently codified with amendments at § 17–27–104(6), C.R.S. (1996 Cum.Supp.)).

Community corrections programs are intended to protect public safety. The language of the legislative declaration indicated that the General Assembly sought to achieve this goal by giving courts more sentencing options, by enabling offenders to pay restitution to their victims, and by giving offenders greater access to rehabilitation programs. While its terms imposed duties on administrators of community corrections facilities, those duties were owed directly to the relevant judicial or executive authorities.

Section 17–27–114 specifically required an offender sentenced to a community corrections facility to comply with the rules of the facility. *Downing v. People,* 895 P.2d 1046 (Colo.1995). Under that statute, if an administrator of a community corrections facility believed a resident had violated a condition of placement, the administrator was required to certify to the sentencing court the facts underlying the alleged violation, and to transfer the resident to the county jail pending resolution of the matter. *Wilson v. People,* 747 P.2d 638 (Colo.1987).

The purposes underlying § 17–27–114 are analogous to the purposes of probation revo-

cations. That is, when a trial court sentences an offender to probation or to community corrections, it requires the offender to obey certain conditions. *Compare* § 16–11–204, C.R.S. (1996 Cum.Supp.) *with* § 17–27–105(1)(b), C.R.S. (1996 Cum.Supp.). These conditions promote the goal of reintegrating the offender into a responsible lifestyle and protecting society against recidivism. *See People v. Ressin,* 620 P.2d 717 (Colo.1980) (probation); *Wilson v. People, supra* (community corrections).

In sum, § 17–27–114 provided a mechanism for sanctioning individuals who have violated the conditions of their placement in community corrections, and gave them an incentive to obey the terms of their placement. The statute also required the sentencing court or other referring agency to coordinate with the community corrections facilities. Although members of the general public may have been incidental beneficiaries of the statute, they were owed no actionable duty by its specific terms. *Cf. Leake v. Cain,* 720 P.2d 152 (Colo.1986); *see also Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985) (Maryland statute similar to § 17–27–114 held to create a duty by probation officer to the court and not to private citizens).

We therefore hold that, because the statute evidenced neither an intent to benefit the public nor a purpose to prevent a particular harm, the statutory scheme in which § 17–27–114 was codified did not establish a private tort remedy against community corrections facilities. *See* Colo. Sess. Laws 1977, ch. 223, § 17–27–101, et seq., at 941–47.

Accordingly, since the statute did not protect persons in Davenport's position or any other member of the general public, the trial court erred in instructing the jury there was such a duty.

### B. Common Law Duty

We also agree with Pikes Peak's contention that it had no common law duty to protect Davenport from Rutledge's conduct.

■ Generally, a person or entity has no duty to prevent a third party from harming another. However, a duty may arise if a special relationship exists between the actor and the wrongdoer or between the actor and the victim. *Leake v. Cain, supra;* Restatement (Second) Torts § 315 (1965).

■ Under Restatement (Second) Torts § 319 (1965):

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

This section is not limited to persons who take charge of third parties exhibiting violent or anti-social propensities. *See* Restatement (Second) Torts § 319, illustration 1 (person carrying highly communicable disease may present significant likelihood of bodily harm to others); *see generally Nero v. Kansas State University,* 253 Kan. 567, 861 P.2d 768 (1993) (in action against a university for damages arising out of a sexual assault in university student housing, court rejected claim of special relationship between university and perpetrator; however, using landowner-invitee analysis, court found duty to use reasonable care to protect occupants of coed housing from foreseeable criminal conduct).

Rather, a special relationship may be created by a statute even under circumstances in which the statute does not specifically support a private right of action or application of the negligence *per se* doctrine. *Felger v. Board of County Commissioners,* 776 P.2d 1169 (Colo.App.1989).

■ According to Davenport, because Pikes Peak had control over Rutledge and knew or should have known he was potentially dangerous, Pikes Peak had a special relationship with Rutledge. Thus, Davenport argues, Pikes Peak had a duty to protect the public from Rutledge. We are not persuaded.

Davenport's reliance on *Perreira v. State,* 768 P.2d 1198 (Colo.1989) is misplaced. There, the supreme court held that psychiatrists who had treated and released an involuntarily hospitalized mental patient owed an actionable duty to the surviving spouse of a

police officer killed by the mental patient shortly after the patient's release.

However, the patient in *Perreira* was hospitalized in part because of his violent behavior. Additionally, the patient had paranoid delusions that police were harassing him. And, throughout his hospitalization, the patient deteriorated, increasingly blaming the police for his physical ailments and missing property. He also expressed an intent to reacquire the gun which police had taken from him during an earlier arrest. Four months after his release from the mental hospital, the patient shot and killed a police officer during an altercation at a convenience store.

In the negligence action brought by the policeman's widow against the treating psychiatrists, the jury found for the plaintiff. On appeal, the supreme court rejected the psychiatrists' contention that they had no actionable duty to protect members of the public from the released patient. It found they had a duty: (1) to exercise due care consistent with the knowledge and skill ordinarily possessed by psychiatric practitioners under similar circumstances in determining whether the patient had a violent propensity which would create an unreasonable risk of serious bodily harm to others; and (2) to take reasonable precautions to protect the public from the danger created by the release of the patient. *Perreira v. State, supra.*

The court based this duty on the weighing of several factors including: the relationship between the psychiatrist and patient; the foreseeability of the serious bodily harm to others resulting from the psychiatrist's decision to release the patient; the social utility of the psychiatrist's decision to release a mentally ill patient from involuntary commitment; the magnitude of any burdens that might devolve on a psychiatrist by virtue of a legal duty of due care in determining whether to release the patient; and the practical consequences of imposing such a duty. *Perreira v. State, supra.*

Although the principles articulated in *Perreira* guide us, we conclude that the facts here are sufficiently distinguishable so as to result in a finding of no duty to this plaintiff.

In a decision involving very similar facts, a Washington appellate court applied the same basic principles used in Colorado and also found no duty. We find that court's analysis helpful here.

*Baumgart v. Grant County,* 50 Wash.App. 671, 750 P.2d 271 (1988) involved an inmate at a county jail who was prematurely released from jail. Later, he became intoxicated and was involved in an automobile accident in which the plaintiff was injured. Like Rutledge, the inmate in *Baumgart* had a history of alcohol-related offenses and was supposed to have been on antabuse, a drug used in the treatment of alcoholism, while he was in custody. And like Rutledge, the inmate in *Baumgart* was in custody for burglary and not an alcohol-related offense.

The *Baumgart* court held that the plaintiff had failed to show sufficient legal causation for the injury, and that any duty was too remote to establish the defendant's liability. In so holding, the court stated that:

> Legal causation ... rests on policy considerations as to how far the consequences of defendant's acts should extend. It involves a determination of whether liability should attach as a matter of law given the existence of cause in fact. If the factual elements of the tort are proved, determination of legal liability will be dependent on (mixed considerations of logic, common sense, justice, policy, and precedent.)

*Baumgart v. Grant County, supra,* 50 Wash. App. at 674, 750 P.2d at 273 (quoting *Hartley v. State,* 103 Wash.2d 768, 779, 698 P.2d 77, 83 (1985)). This causation analysis closely parallels the test used in Colorado for determining the scope of a duty. *See Taco Bell v. Lannon, supra.*

We reach the same conclusion here as did the *Baumgart* court. Like the inmate in *Baumgart* but unlike the mental patient in *Perreira*, Rutledge was confined at Pikes Peak for punitive correction after having been found guilty of burglary. The burglary was not indicative of the kind of behavior which led to the accident injuring Davenport.

Further, the special relationship between Pikes Peak and Rutledge was discernibly less

custodial than the involuntary hospitalization involved in *Perreira* or even the custodial relationship between a jailer and a prisoner in a traditional correctional facility. While Rutledge was provided with alcohol-related therapy, he was not exposed to the intense type of psychiatric examination that an involuntarily committed mental patient presumably would have been provided. Rutledge's custodians also were less well-equipped to diagnose his potentially dangerous propensities than were the psychiatrists in *Perreira*, and they acted within their authority in permitting Rutledge to leave the halfway house. *See Baumgart v. Grant County, supra; see also Moore v. Commonwealth Department of Justice,* 114 Pa.Cmwlth. 56, 538 A.2d 111 (1988).

Also missing here is the degree of foreseeability found in *Perreira*. While Rutledge had been charged with drinking and driving, the driving related charges had been dismissed. Rutledge's sentence to Pikes Peak was based on his conviction for burglary and his punishment was unrelated to his alcoholism. Before the accident, Rutledge was found to have consumed alcohol only on two occasions during the year he resided at Pikes Peak, and many of his other violations of Pikes Peak's rules involved the failure to take antabuse and were unaccompanied by evidence that he had consumed alcohol.

Nor did Rutledge display any bizarre, violent, or aberrant behavior, or any other symptom of alcoholism that would set him apart from numerous other community corrections residents with substance abuse problems. *Compare Perreira v. State, supra, with Baumgart v. Grant County, supra.*

Thus, the linkage between Pikes Peaks' allegedly negligent conduct and the later automobile accident is too attenuated for us to conclude that Rutledge's conduct and Davenport's injuries were reasonably foreseeable to Pikes Peak. *Cf. Casebolt v. Cowan, supra* (trial court erred in granting summary judgment on the duty question in a negligent entrustment case because material questions of fact remained).

A contrary holding would impose upon every halfway house and community corrections facility the choice of acting as an insurer against the negligent conduct of its residents, or imposing substantial restrictions on its residents' access to the outside community. Both alternatives would frustrate the legislative purpose underlying the establishment of community corrections as a sentencing alternative. The threat of boundless liability for a resident's or former resident's conduct also would threaten the financial stability of the community corrections industry, making community corrections a far more costly sentencing option. The alternative of curtailing community corrections residents' access to the outside community would frustrate the legislative goal of reintegrating residents into the law abiding community and encouraging them to remain gainfully employed.

Accordingly, as in *Baumgart,* logic, justice, and common sense persuade us that Pikes Peak had no duty to protect Davenport from Rutledge's negligence. *Baumgart v. Grant County, supra; see generally* Annot., *Liability of Private Operator of "Halfway House" or Group Home Housing Convicted Prisoners Before Final Release for Injury to Third Person Caused by Inmate,* 9 A.L.R. 5th 968 (1993).

## II.

Because Pikes Peak did not argue on appeal that it was immune from liability under an extension of the doctrine of quasi-judicial immunity or official discretionary immunity, we do not address the issue.

Pikes Peak's other contentions of error are moot as are Davenport's contentions on cross-appeal, and we do not address them.

The judgment is reversed and the cause is remanded with directions to dismiss the complaint for failure to state a claim on which relief can be granted.

JONES and BRIGGS, JJ., concur.