**Eric DAVENPORT, Petitioner,**

v.

**COMMUNITY CORRECTIONS OF THE PIKES PEAK REGION, INC., Respondent.**

**No. 97SC266.**

Supreme Court of Colorado, En Banc.

June 29, 1998.

As Modified on Denial of Rehearing July 27, 1998.

Roberta Earley, Colorado Springs, Drew Moore, Grand Junction, for Petitioner.

Hall & Evans, L.L.C., Alan Epstein, Jeffery B. Stalder, Denver, for Respondent.

John P. Giduck, Denver, for Amici Curiae Colorado Community Corrections Coalition; Community Corrections Services, Inc.; and Adams Community Corrections Program, Inc.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *Davenport v. Community Corrections of the Pikes Peak Region, Inc.*, 942 P.2d 1301 (Colo.App.1997), to consider whether the court of appeals erred in concluding as a matter of law that a private community corrections facility has neither a

statutory nor common law duty to protect an individual from the conduct of an offender sentenced to the facility. The court of appeals reversed a jury verdict awarding the plaintiff damages for injuries sustained in an automobile accident involving a community corrections resident. We affirm.

## I.

Community Corrections of the Pikes Peak Region, Inc. (Pikes Peak), is a private non-profit corporation that operates a community corrections facility in Colorado Springs pursuant to a contract with the Division of Criminal Justice of the Colorado Department of Public Safety. Offenders housed at Pikes Peak are required to maintain steady employment, undergo random drug and alcohol testing, pay rent on a weekly basis, and attend budgeting classes. Pikes Peak participants are only permitted to leave the facility for work, job searching, or pursuant to a valid curfew, weekend, church, overnight, or furlough pass.

On April 21, 1988, Fred Rutledge was sentenced directly to community corrections for eight years after being convicted of second degree burglary. As a condition of his sentence, Rutledge was ordered to undergo treatment for alcohol abuse. Rutledge was admitted to Pikes Peak on April 28, 1988. On several occasions during his eight and one-half month stay at Pikes Peak, Rutledge violated rules pertaining to the administration of the facility. Specifically, Rutledge (1) was late signing in; (2) failed to take antabuse on three occasions; [1] (3) failed two drug tests; (4) twice tested positive for alcohol; [2] and (5) was involved in a careless driving incident. Although these offenses were clas-

sified by Pikes Peak as major offenses which could, depending upon the severity and circumstances of the offense, result in notification to the sentencing judge, the sentencing judge was never notified.

On January 14, 1989, Rutledge was permitted to leave Pikes Peak on a weekend pass. Rutledge went to the house of Eric Davenport, a friend and former resident at Pikes Peak. At the house, Rutledge and Davenport began drinking beer. Later, they left in Rutledge's car, which Rutledge drove. [3] After stopping at a liquor store, Rutledge drove at a high rate of speed and rolled the automobile. Davenport suffered permanent debilitating injuries in the accident. [4] Rutledge was arrested and charged with vehicular assault, reckless driving, driving under the influence, driving with excessive alcohol content, driving with an expired temporary registration, and driving without compulsory insurance. Rutledge was subsequently terminated from the Pikes Peak program.

On July 13, 1990, Davenport sued Pikes Peak for negligent supervision of Rutledge. In responding to the complaint, Pikes Peak designated Rutledge as a non-party at fault pursuant to section 13–21–111.5, 6A C.R.S. (1987). On March 20, 1992, Pikes Peak filed a motion for summary judgment, asserting that Pikes Peak owed no legal duty to Davenport as a matter of law. The trial court denied the motion, concluding that "there is a duty upon entities such as [Pikes Peak] to exercise reasonable care to protect members of the public from harm caused by persons" in their custody.

Following a trial, the jury found Pikes Peak ninety percent at fault for Davenport's

---

1. Antabuse contains the drug disulfiram, which produces a severe adverse physical reaction when mixed with alcohol. Antabuse is used to create an aversion to alcohol in the treatment of chronic alcoholism.

2. One of the two tests revealed that Rutledge's blood alcohol content was 0.27. On the night of that test, Rutledge apparently drove himself and two other residents back to Pikes Peak following a disagreement with his ex-wife. Following an administrative hearing, Rutledge was placed on fourteen days' disciplinary restriction, ordered to perform ten hours of extra duty, and lost seven days of good time credit.

3. Prior to being allowed to drive a vehicle, offenders housed at Pikes Peak had to obtain driving authorization. This process required production of a valid license, driving record, ownership information, and proof of insurance. Although Rutledge had received authorization from Pikes Peak to drive three separate vehicles, the vehicle Rutledge was driving on the night in question was apparently not authorized by Pikes Peak.

4. Following the accident, Rutledge had a blood alcohol content of 0.141.

injuries and allocated the remaining ten percent of fault to Rutledge. No fault was assigned to Davenport. The jury then assessed economic damages at $435,000, disfigurement damages at $10,000, and non-economic damages at $1,468,000. After reducing the assessed non-economic damages to $250,000 pursuant to section 13–21–102.5, 6A C.R.S. (1987), the trial court entered judgment for Davenport against Pikes Peak in the amount of $625,500, representing ninety percent of the total damages assessed.

The court of appeals reversed, concluding as a matter of law that Pikes Peak owed no duty to protect Davenport from Rutledge's conduct. Specifically, the court of appeals determined that the statutes governing community corrections did not impose a statutory duty on Pikes Peak to protect members of the public from offenders participating in the program. Additionally, the court of appeals concluded that Pikes Peak owed no common law duty to protect Davenport from Rutledge's conduct. Because it determined that no duty existed, the court of appeals remanded the case to the trial court with directions to dismiss Davenport's complaint.

## II.

▪ To recover on a claim of negligence, the plaintiff must establish the existence of a legal duty on the part of the defendant, breach of that duty by the defendant, causation, and damages. *See Observatory Corp. v. Daly,* 780 P.2d 462, 465 (Colo.1989). The initial determination of whether a defendant owes a duty to the plaintiff is a question of law to be considered by the court. *See Casebolt v. Cowan,* 829 P.2d 352, 356 (Colo.1992). A negligence claim must fail if it is based upon circumstances for which the law imposes no duty of care upon the defendant. *See University of Denver v. Whitlock* 744 P.2d 54, 56 (Colo.1987).

In this case, Davenport challenges the court of appeals' decision as it relates to two different issues concerning Pikes Peak's duty. We address each issue separately.

### A. Statutory Duty

Davenport argues that the legislative scheme authorizing community corrections supports the imposition of a duty of care on Pikes Peak. We disagree.

▪ A legally imposed duty of care may be derived from a legislative enactment. *See Leake v. Cain,* 720 P.2d 152, 162 (Colo.1986). In this regard, a duty of care is established where the plaintiff is a member of the class the statute was designed to protect, and where the injury suffered is the type of injury which the statute was enacted to prevent. *See id.*

Section 17–27–101, 8A C.R.S. (1989 Supp.), in effect at the time of the accident, provides as follows:

(1) It is the purpose of this article to encourage flexibility in the development of community correctional facilities and programs by the department, units of local government, and nongovernmental agencies and to encourage the use of such facilities and programs by sentencing courts. It is the further purpose of this article to provide a procedure through which units of local government and nongovernmental agencies may provide adult services to the department and to sentencing courts.

(2) It is the intent of the general assembly that community correctional facilities and programs be used to protect the public safety by serving the following purposes:

(a) With respect to offenders sentenced to community corrections by the courts, to provide a sentencing option and to increase the potential for victim restitution and offender access to rehabilitation programs;

(b) With respect to offenders transferred to community corrections by the department of corrections for long-term placement, to provide the least restrictive and least expensive custodial setting for such offenders;

(c) With respect to other offenders transferred to community corrections by the department of corrections for short-term, prerelease placement, to provide programs to effectuate the reintegration of such offenders into the community and to

ensure that such offenders have the opportunity for transitional community placement before their release from custody. Additionally, section 17–27–114(1), 8A C.R.S. (1986), provided that,

> [w]here the administrator of a community correctional facility ... has cause to believe that an offender placed in a community correctional facility has violated any rule or condition of his placement in that facility ... or cannot be safely housed in that facility, the administrator ... shall certify to the appropriate judicial or executive authority the facts which are the basis for his belief and execute a transfer order ... to transport the offender to the county jail in the county in which the facility is located where he shall be confined pending a determination by the appropriate court or executive authorities as to whether or not the offender shall remain in community corrections.

 The legislative scheme authorizing the use of community corrections explicitly provides that one of its goals is to promote public safety. *See* § 17–27–101(2). Contrary to Davenport's arguments, however, the community corrections statutes are not designed to protect the public from the immediate threat posed by participating offenders.[5] Instead, community corrections promote long-term public safety by gradually reintegrating the offender into society using nontraditional rehabilitation techniques. *See* § 17–27–101(2); *Wilson v. People,* 747 P.2d 638, 640 (Colo.1987). Furthermore, although section 17–27–114(1) requires community corrections administrators to report violations of placement conditions, the court of appeals correctly notes that any duties created by that obligation "were owed directly to the relevant judicial or executive authorities" and not the general public. *See Davenport,* 942 P.2d at 1304; *see also Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297, 1305–06 (1985) (explaining that probation orders and statutes requiring probation officers to notify court of any probation violations created a duty to the court and not the general public).

The community corrections statutes do not create a class of persons requiring legislative protection and offer no indication that, in authorizing the use of community corrections, the General Assembly sought to prevent injuries such as Davenport's. *See Leake,* 720 P.2d at 162. Accordingly, we agree with the court of appeals that the community corrections statutes do not create a statutory duty of care.

### B. Common Law Duty

Davenport also argues that Pikes Peak owed him a common law duty to protect him from Rutledge's misconduct. We disagree.

 Where a person should reasonably foresee that his act, or failure to act, will involve an unreasonable risk of harm to another, there is a duty to avoid such harm. *See Leake,* 720 P.2d at 160. Generally, however, a person has no duty to prevent a third person from harming another absent special circumstances warranting imposition of such a duty. *See id.; see also* Restatement (Second) of Torts § 315 (1965).[6] We have previously focused judicial attention on the following factors in considering whether to impose an actionable common law duty on a defendant who fails to prevent a third person from harming another: (1) the existence of a special relationship between the parties; (2) the foreseeability of harm to others; (3) the so-

---

5. In fact, placing offenders in the "least restrictive and least expensive custodial setting" seemingly places the public in more immediate danger than the restrictive and costly option of placing offenders in prison. *See* § 17–27–101(2)(b).

6. The difference between misfeasance and nonfeasance has been summarized as follows:

 > In determining whether a defendant owes a duty to a particular plaintiff, the law has long recognized a distinction between action and a failure to act—"that is to say, between active misconduct working positive injury to others [misfeasance] and passive inaction or a failure to take steps to protect them from harm [nonfeasance]." ... "The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs."

 *Whitlock,* 744 P.2d at 57 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56, at 373 (5th ed.1984)).

cial utility of the defendant's conduct; (4) the magnitude of the burden of guarding against injury or harm; and (5) the practical consequences of placing a duty upon the defendant. *See Perreira v. State*, 768 P.2d 1198, 1214–15 (Colo.1989); *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987).

■ Whether a special relationship exists between Pikes Peak and Rutledge depends, in large part, upon the level of control exercised by Pikes Peak over its residents. *See Perreira*, 768 P.2d at 1215–16; *see also* Restatement (Second) Torts § 319 (1965). Although Pikes Peak serves a custodial role and has a contractual obligation to closely monitor the activities of its residents, Pikes Peak exerts far less control over its residents than a prison. Pikes Peak residents maintain full-time employment, provide their own transportation, and readily obtain curfew, weekend, church, overnight, and furlough passes. Thus, offenders housed at Pikes Peak spend a substantial amount of time off the premises without direct supervision. We are therefore persuaded that the level of control exerted by Pikes Peak over Rutledge is insufficient to establish a special relationship in this case. *See Baumgart v. County of Grant*, 50 Wash.App. 671, 750 P.2d 271, 274–75 (1988).

Furthermore, there is no special relationship between Pikes Peak and Davenport because Davenport did not depend upon Pikes Peak to alert him of the known and obvious dangers associated with riding in Rutledge's car after both men had been drinking. *See* Restatement (Second) of Torts § 314 A cmt. b (1965) (dependence is a basis for recognition of a special relationship); *see also Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 203 (Colo.1992) (explaining that "[w]hen a manufacturer or seller knows or should know of unreasonable dangers associated with the use of its product and the dangers are not obvious to product users, a manufacturer has an obligation to warn of the dangers and a breach of that obligation constitutes negligence"); *Whitlock*, 744 P.2d at 62 (explaining that "[t]here exists no special relationship between the parties that justifies placing a duty upon the University to protect [plaintiff]

from the well-known dangers of using a trampoline").

While it is foreseeable that reintroducing convicted criminals into the community will result in some aberrant behavior, the dangers associated with community corrections in general are insufficient to establish the requisite foreseeability needed to impose a duty of care. *See Henderson v. Gunther*, 931 P.2d 1150, 1158 (Colo.1997) (explaining in the context of a § 1983 action that "we recognize that many state activities have the potential for creating some danger. However, not every danger or vulnerability to danger created by the State gives rise to a corresponding duty to protect"). To create such a duty, the authorities responsible for supervising the offender must or should be aware that the offender possesses a particular trait that poses a danger to the plaintiff. *See* Restatement (Second) Torts § 319. Here, Rutledge was convicted of second degree burglary and, although he was being treated for alcoholism, there are only two reported instances of his violating Pikes Peak's alcohol policy during his eight and onehalf months at Pikes Peak. In both of the instances involving alcohol use, Rutledge was disciplined. While one of these violations also involved Rutledge's use of an automobile, we find that this incident and the isolated and nonviolent behavior arising from Rutledge's alcohol use do not establish that Pikes Peak knew or should have known that Rutledge posed a significant risk of harm to Davenport.

On a more general level, there is a high degree of social utility associated with community corrections programs such as Pikes Peak. Community corrections are state-funded community-based programs designed to divert offenders from correctional facilities and reintegrate incarcerated offenders into society. *See People v. Abdul*, 935 P.2d 4, 6 (Colo.1997). As we have previously observed,

[c]ommunity corrections programs utilize a variety of means, including halfway houses and work release programs, to enable offenders to reside in the community. The basic objective of such programs is "to limit confinement to the extent necessary to assure reasonable supervision while per-

mitting a gradual reintegration of the offender into the society to which the offender would eventually return."

*Wilson,* 747 P.2d at 640 (quoting *American Bar Association Standards for Criminal Justice,* Sentencing Alternatives and Procedures, Standard 18–2.4, Commentary at 102 (1986 Supp.)). Community corrections programs also provide sentencing judges with an intermediate penalty that is more severe than probation, yet not as harsh as incarceration. *See Beecroft v. People,* 874 P.2d 1041, 1045 (Colo.1994); *People ex rel. Van Meveren v. District Court,* 195 Colo. 34, 36, 575 P.2d 4, 6 (1978). Furthermore, the General Assembly has determined that direct sentencing to community corrections promotes public safety by increasing the potential for victim restitution and by providing offenders with access to rehabilitation programs. *See* § 17–27–101(2)(a). Finally, the fiscal savings associated with the community corrections program are considerable. *See* Lynn S. Branham, *A Federal Comprehensive Community Corrections Act: Its Time Has Come,* 12 T.M. Cooley L.Rev. 399, 403–07 (1995).[7]

Imposing an actionable duty in this case would have wide-ranging practical consequences in the community corrections system. Clearly, each offender sent to community corrections poses a potential danger to the public because the offender has engaged in criminal behavior in the past and is likely to have a substance abuse problem.[8] *See Martinez v. California,* 444 U.S. 277, 281, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (explaining that "the basic risk that repeat offenses may occur is always present in any parole system"). Therefore, requiring Pikes Peak to act as the insurer of its residents would subject community corrections facilities to substantial liability exposure. Furthermore, imposition of a legal duty in this case would subvert the effectiveness of the community corrections program. Pursuant to their authority to "accept, reject or reject after acceptance the placement of any offender in its community correctional facility," each community corrections facility would be forced to screen out offenders posing a foreseeable threat to the general public, thereby limiting the number of offenders placed in the program. *See* § 17–27–103(3); *People v. Wilhite,* 817 P.2d 1017, 1019 (Colo.1991). Once offenders are admitted into community corrections, the facility would be forced to restrict an offender's community access in order to limit its exposure. Besides the obvious financial burden associated with this increased supervision, program participants would be deprived of the opportunity to fully reintegrate themselves into their communities. *See Wilson,* 747 P.2d at 640.

After considering each of the factors used to determine whether a defendant owes a common law duty to prevent a third person from harming the plaintiff, we hold that the court of appeals correctly ruled as a matter of law that Pikes Peak owed Davenport no duty to protect him from Rutledge's misconduct.

## III.

The decision of the court of appeals is affirmed.

---

7. One commentator has explained that in 1993, it cost an average of $19,118.70 to confine one person in jail for a year. See Branham, *supra* at 403. Conversely, the commentator explains that [i]f offenders are punished in the community rather than incarcerated, they can, if employed, retain their jobs and continue working.... [T]here are economic benefits—to taxpayers, to victims, and to the families of offenders. Offenders who work add, through the payment of taxes, money to the public coffers. They are also better able to pay restitution to the victims of their crimes. And they can continue to financially support their families, instead of having the taxpayers support them through welfare payments. *Id.* at 407.

8. Steven Gilmore, the director of operations at Pikes Peak, testified that approximately eighty-five percent of offenders participating in the Pikes Peak diversion program have some level of substance abuse problem.